GILL et al.

v.

**SEABOARD AIR LINE R. CO.**

No. 6623.

United States Court of Appeals Fourth Circuit.

Argued Oct. 15, 1953.

Decided Nov. 10, 1953.

J. C. Moore, Jr., Raleigh, N. C. (Robert Ruark, Raleigh, N. C., Leo A. Sparer, New York City, and J. Francis Paschal, Raleigh, N. C., on brief), for appellant and cross-appellee.

Murray Allen, Raleigh, N. C. (R. P. Upchurch, Raleigh, N. C., on brief), for appellee and cross-appellant.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

These appeals are taken from judgments in favor of the Railroad Company in three cases consolidated for trial in the District Court which were instituted by the administrator of the estates of three persons who were killed on January 16, 1951 when an automobile truck in which they were riding was struck by a passenger train at a grade crossing near Henderson, North Carolina. The crucial questions relate to the sufficiency of the evidence to show negligence on the part of the Railroad Company in the operation of the train and to the validity of certain releases given to the Railroad Company by the administrator after the accident.

At the time of the accident, William Oliver Long, the driver of the truck, his wife, Jessie Thomas Long, and two of their minor children, William Thomas Long and Lucy May Long, were seated together on the seat of the truck and all of them were killed except Lucy May Long. The parents left surviving nine children, of whom the oldest was sixteen years of age.

The accident occurred in the open country about a mile south of Henderson at a point where a public road, which runs approximately parallel to the railroad, crosses the tracks at an angle. There are two tracks at the crossing. The westerly track is the main line and the easterly track is a switching or pass track which is used by freight trains in taking cars to and from Henderson. When a freight train stops for these purposes and obstructs the crossing, it is customary to break the train so as to allow the passage of cars on the highway. The crossing is equipped with a warning bell and with blinking lights which operate when a train approaches the crossing and continue to operate while the train is within a specified area even if it does not actually block the crossing.

About 1 P. M. on the day of the accident a freight train approached the crossing from the south, and in the course of an operation, in which certain cars were cut out for Henderson and certain cars were taken on for Richmond, blocked the highway for ten or fifteen minutes and automobiles waiting to cross the tracks were standing in line on both sides of the crossing. A trainman then uncoupled the caboose at the end of the train and left it standing south of the crossing at a distance variously estimated at forty-five to one hundred feet. The remainder of the train proceeded some distance northerly towards Henderson so that the highway was cleared for the automobile traffic. The trainman who cut off the caboose boarded the moving freight train and rode for a short distance to a switch north of the crossing and then alighted at a point fifty feet from the crossing. He gave no heed to the waiting automobiles.

At that moment a passenger train running on the westerly main track toward Henderson at the rate of sixty-five miles per hour and sounding its whistle approached the crossing from the south, and at the same time the Long truck, which had been waiting at the head of the line ten feet from the crossing on the east side, drove on to the main track in front of the passenger train and was destroyed. The driver's view of the approaching train, while the truck stood waiting to cross, was obstructed by the caboose of the freight train parked on the south side of the crossing

The distance from the waiting truck to the nearer rail of the main line was about eighteen feet and there was a short space to be traversed by the truck before it reached the main line within which the driver could have seen the train coming from the south and stopped if he had been driving at a slow speed. The train was in fact seen an instant before the collision by the girl riding on the truck, who survived the accident, and she called to her father to stop.

The driver of the leading car on the west side of the main line had a clearer view to his right and his rear in the direction from which the passenger train approached. He also started to cross when the caboose was set off from the rest of the train, but catching sight of the passenger train he stopped and backed his car in a place of safety.

The trainman on the freight train testified that he did not hear the passenger train while riding on the freight cars after uncoupling the caboose, because of the noise of the wheels, but he heard the whistle of the passenger train when he dropped off. Then looking around he saw the passenger train when it was only two hundred feet from the crossing and saw the truck crossing the main line with its front wheels already over the first rail. When the freight train was opened, and the automobiles were allowed to pass, the trainman made no attempt to see if the main line was clear or to direct the passage of the automobiles waiting to cross.

The appalling news of the catastrophe was heard by radio that afternoon by Thomas Gill, the father of Mrs. Long and the grandfather of the nine surviving children. He was a tenant farmer sixty-eight years of age who lived about seven miles from Henderson. He testified that a white lady taught him to read a little and to sign his name, but that he attended school only as far as the second grade. His first action upon hearing about the accident was to go to his daughter's house and bring the children to his house and he attended the coroner's inquest which was held on the day of the accident and the following day. The coroner told him that he would find a way to provide for the funeral. Thereafter the transactions took place which culminated in the releases on which the Railroad Company relies.

A lawyer, whom Gill knew only by sight was found for him and together they went to the county seat and Gill was appointed administrator for each of the three estates of the deceased. Subsequently, during the evening of January 19, he went to the office of the attorney for the Railroad Company in Henderson and signed two releases for $300 each and one release for $350 as administrator of the three estates. These documents purported to release the Railroad Company from all liability for the deaths of the deceased. He testified that he signed these documents but that they were not read to him and that he did not understand that they were intended to release the company from all liability, but was told that they were designed to cover the funeral expenses of the deceased persons, whose funerals had not yet been held; and that the rights of the surviving children would be considered when "the big court met". Three checks aggregating $950, were delivered to him as administrator. Each bore the statement that it was given in full settlement of all claims arising from the death of the person to whose estate the payment was made. The checks were endorsed by Gill and handed to the undertaker who retained $750 for his services and paid the balance to Gill's attorney.

Gill's attorney was called to the witness stand by the judge and testified that Gill was brought to his office and introduced to him by the undertaker after the settlement had been agreed upon; that he was employed merely to secure Gill's appointment as administrator of the three estates and that he took no part in the settlement and did not advise Gill as to the amount involved or the fairness of the settlement when the releases were

executed at the office of the attorney for the Railroad Company.

There was, however, explicit testimony by the undertaker, a witness for the plaintiff, that the attorney for the railroad company read and explained the papers to Gill and told him that the checks were given in full settlement of all obligations of the company. This testimony was corroborated by the attorney of the Railroad, the claim agent of the Railroad, and the attorney who procured the appointment of Gill as administrator of the three estates.

The cases were submitted to the jury upon issues (1) as to the negligence of the Railroad Company; (2) the contributory negligence of the driver of the truck; (3) the understanding of Gill as to the nature and effect of the releases, and (4) the amount, if any, which the administrator was entitled to recover in each case. The jury by its verdict found that the deceased persons were killed by negligence of the Railroad Company, that the driver of the truck was guilty of contributory negligence and his administrator was not entitled to recover anything, and that the administrator was entitled to recover $1500 on account of the death of Mrs. Long and $2500 on account of the death of her son.

Prior to the submission of the cases to the jury the defendant moved for a directed verdict in its favor on all issues but the court reserved its ruling and submitted the issues to the jury. After the verdict the defendant moved the court to set the jury's findings aside insofar as they were favorable to the plaintiff, and to enter a judgment for the defendant. The court, after hearing argument, ruled that the verdict in favor of the administrator as to his execution of the releases without understanding their nature and effect, should be set aside, and thereupon entered judgment for the defendant in all of the cases.

The Railroad Company urges, irrespective of the validity of the releases, that the judgment should be affirmed because the accident was caused solely by the negligence of Long and not by any negligence on the part of the Railroad; and hence the judge should have directed the jury to find for the Railroad Company on this issue. It is pointed out that immediately after the freight train was parted, Long drove a distance of twenty-four feet from his parking position across the pass track and upon the main track in front of the passenger train, although crossing signals were in full operation and he was warned by his daughter; and it is said that if he had driven slowly and carefully, and had looked to his left when he got to a point where he could see the main track beyond the caboose, he would have seen the passenger train and avoided the collision.

We think that these circumstances fully justified the submission to the jury of the issue of Long's contributory negligence; but that there was still room for the finding that the Railroad Company negligently created a situation without which the accident would not have occurred, and hence the passengers in the automobile were entitled to recover.

The trainman who uncoupled the caboose was aware that autos on both sides had been waiting for some minutes to cross the track and he separated the freight cars so as to leave an opening. Whether this was done for the convenience of the users of the highway or in order to facilitate the switching operation is immaterial, for in the absence of any warning from the railroad men, it furnished an opportunity, if not an invitation, to the persons waiting to cross the track. Persons on both sides of the track had this understanding for they immediately started to go. The leading automobile on the west side actually got on the main track but the driver, catching sight of the passenger train, was able to back off in time, while Long, whose view for a considerable part of the twenty-four feet was obscured by the caboose, did not stop within the short distance

and the brief time available. His whole movement could not have lasted more than a few seconds. These persuasive circumstances are not offset by the fact that the danger signals continued to operate after the cars of the freight train were separated. The evidence shows that the presence of the standing caboose within a short distance of the crossing was sufficient to create this effect and that this fact was generally known. The trainmen on the freight were not without knowledge that the main track was constantly in use by other trains going at a high rate of speed, and since they performed the affirmative act of opening the freight train so as to provide a crossing for the automobiles and located the caboose so as to obscure Long's view of the track of the main line to the south and made no effort to ascertain whether the main track was clear, there was sufficient evidence to submit to the jury the issue of negligence on the part of the Railroad Company.

The case is not unlike Finch v. North Carolina R. Co., 195 N.C. 190, 141 S.E. 550, where the driver of an automobile on one of the two main streets of a town which ran parallel with the tracks of a railroad desired to cross the tracks at a grade crossing but found it blocked by a freight train and stopped six or eight feet from the tracks. Other vehicles were also waiting to cross. Two or three minutes later the conductor of the train caused it to be separated enough to clear the crossing and followed the moving portion of the train across the opening. The driver of the automobile started without looking or listening and was struck by a passenger train going at sixty miles an hour on a parallel track which the driver could not see because of the freight. There were no guards or signals at the crossing and the passenger train gave no notice of its approach. It was held that the question of the negligence of the Railroad Company and the contributory negligence of the driver of the automobile were for the jury under proper instructions as to whether the defendant's negligence was the proximate cause of the injury or the driver's negligence proximately contributed thereto. See also Brown v. Atlantic Coast Line R. Co., 208 N.C. 57, 179 S.E. 25.

The Railroad Company contends that the instant case is governed by decisions in North Carolina which announce the rule that the passive negligence of a railroad company in failing to keep a crossing in repair or a person who negligently leaves an obstruction on the highway will not give a right of action to a passenger in an automobile who is injured by the intervening active negligence of the driver. In such cases it is said that the gross negligence of the driver "insulates" the negligence of the defendant. See Smith v. Sink, 211 N.C. 725, 192 S.E. 108; Godwin v. Nixon, 236 N.C. 632, 74 S.E.2d 24; Herman v. Atlantic Coast Line R. Co., 197 N.C. 718, 150 S.E. 361; Hinnant v. Atlantic Coast Line R. Co., 202 N.C. 489, 163 S.E. 555; Reeves v. Staley, 220 N.C. 573, 18 S.E.2d 239. We think, however, that the instant case falls within the qualification of the rule which is stated in Powers v. S. Sternberg & Co., 213 N.C. 41, 44, 195 S.E. 88, 90, as follows:

"Where, however, the second actor does not become apprised of such danger until his own negligence, added to that of the existing perilous condition, has made the accident inevitable, the negligent acts of the two tort-feasors are contributing causes and proximate factors in the happening of the accident and impose liability upon both of the guilty parties.

The decision of the Supreme Court of North Carolina in analogous cases when applied to the facts of the instant case justified the submission to the jury of the issue as to whether the act of Long in driving in the path of the passenger train was the sole proximate cause of the disaster or whether it combined with the active negligence of the railroad to produce that result.

The conflicting evidence in regard to the Administrator's understanding of the releases likewise required the submission of an appropriate issue to the jury. The testimony on the part of the railroad that the releases were read and their true nature and effect explained to Gill before he signed them, and that the settlement was taken in entire good faith on the part of the Railroad Company and was based on the "nuisance" value rather than on the merits of the cases, is very strong; but, on the other hand, there is equally positive evidence by Gill that the releases were not read or explained to him and that he was told that the money was being paid to him at the time to enable him to bury his dead and that the rights of the surviving children would be considered at a later date. To this story must be added the circumstances under which the transaction took place. An ignorant elderly man who, in the words of the judge's charge, "didn't know how to read and didn't read", was weighed down by the tragic loss by sudden death of three members of his family, and burdened by the urgency of the situation and the responsibility for the future lives of nine minor children. He was confronted by an opposing lawyer and by other persons of greater experience and intelligence than himself, without any attorney to guide him; and he was paid a grossly inadequate sum of money as compensation for the death of three persons if the railroad had any liability for the accident. These circumstances composed a framework for his testimony that justified the inquiry of the jury as to whether he was telling the truth. We are dealing with an illiterate man and not with one who, being able to read, signs a document without being induced by fraud or deception, and later seeks to avoid its effect on the ground that he did not read it but relied on what he was told as to its contents. A case of the latter class is governed by such decisions as School Committee of Providence Township v. Kesler, 67 N.C. 443, 448; Harrison v. Southern R. Co., 229 N.C. 92, 95, 47 S.E.2d 698.

We think, however, that the issue submitted to the jury in regard to the releases was not properly framed. The issue submitted was whether the releases were executed by the plaintiff without understanding of their nature and effect and the jury's affirmative answer may have been based upon the finding that the releases were signed by a mistake on Gill's part alone. The North Carolina Supreme Court has not adopted the doctrine that unilateral mistake, unaccompanied by fraud, imposition, undue influence or like circumstances of oppression is sufficient to avoid a contract. See Cheek v. Southern R. Co., 214 N.C. 152, 198 S.E. 626. The plaintiff tendered as an issue the question whether the execution of the releases was procured by fraud or undue influence, but the judge declined to give it. We think that there was evidence sufficient to take the case to the jury on this issue and that there was reversible error in refusing to submit it and in entering judgment n. o. v. for the defendant.

The judgment for the defendant in the case of William Oliver Long will be affirmed; but the judgments in the cases of Jessie Thomas Long and William Thomas Long will be reversed and they will be remanded for a new trial on the issue as to the validity of the releases. If the jury finds for the defendant on this issue, judgments should be entered in its favor; but if the finding is in favor of the administrator, judgments should be entered for him in these cases for the amounts specified in the verdicts rendered in the trial now under review.

Affirmed as to case of William Oliver Long. Reversed and remanded as to cases of Jessie Thomas Long and William Thomas Long.