## GIFFORD
### v.
## WICHITA FALLS & S. RY. CO.
### No. 14715.

United States Court of Appeals,
Fifth Circuit.

March 26, 1954.

Rehearing Denied May 3, 1954.

Philip S. Kouri, Tom D. Glazner, Jack G. Banner, Wichita Falls, Tex., for appellant.

John H. Alvis, Abilene, Tex., H. W. Fillmore, Leslie Humphrey, Wichita Falls, Tex., J. B. Look, Jr., Abilene, Tex. (Bullington, Humphrey, Humphrey & Fillmore, Wichita Falls, Tex., Wagstaff, Harwell, Wagstaff & Alvis, Abilene, Tex., of counsel), for appellee.

Before HUTCHESON, Chief Judge, and HOLMES and BORAH, Circuit Judges.

HUTCHESON, Chief Judge.

This is an appeal from a judgment in a personal injury suit, entered on a verdict directed for defendant on the ground that plaintiff had executed a full and complete release.[1] It presents

---

1. "This agreement and release made and entered into by and between Ben Nolan Gifford, of Graham, Young County, Texas, party of the first part, and The Wichita Falls & Southern Railroad Company, a corporation acting by and through its General Manager, H. S. Lemmons, party of the second part.

"Whereas, party of the first part, while in the employ of the second party, and on or about November 21st, 1951, at a point about seven miles North of Ranger, Texas, sustained serious and permanent injuries, to-wit: The loss of a foot, about six inches above the ankle, which caused and necessitated its amputation, and whereas, said first party has suffered loss of time in the past, hospital and doc-

tor's bills, pain and suffering, and loss of time in the future, and his injury is permanent.

"Whereas, the party of the first part and party of the second part have reached a full and complete settlement, owing by party of second part, its agents, servants and employees, and party of the second part, in consideration of such settlement, does hereby release said second party, its agents, servants and employees from any and all claims, for damages by reason of such injury including loss of time in the future, permanent injuries, damages and doctor's and hospital bills.

"Therefore, the said party of the first part in consideration of the sum of $6000

the single question whether, as plaintiff contends, his evidence[2] was sufficient to entitle him to go to the jury on his claim that the release was procured by fraud.

The suit was brought in the Federal Court under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., by appellant Ben N. Gifford to set aside a release executed by him and to recov-

to him paid in cash by party of the second part, the receipt of which is hereby acknowledged and confessed, and in addition thereto to pay the cost to first party of an artificial foot, does by these presents fully and unconditionally release the party of the second part, its agents, servants, and employees and its successors or assigns from any and all damages, costs, expense, or liability whatsoever growing out of said injury aforesaid, or incident thereto, whether such injury is now known or unknown, or disclosed or undisclosed, and first party further represents that there has been no representation made by second party, its agents, servants, or employees to induce this settlement except as stated in this agreement, and this agreement comprises the full and complete settlement between the parties and upon the payment of the $6000, the second party will be under no obligation whatever, except to pay the cost of an artificial foot, all of which is fully understood by the parties hereto."

2. Gifford testified in substance: that he was 39 years of age and had reached the eighth grade in school and that he had worked for the railroad about eight months on Nov. 21, 1951, the date of his accident; that he was in the hospital twenty-eight days; and that his foot was amputated; that H. S. Lemmons, General Manager of the railroad and a Mr. Jernigan who works in the railroad's office came to see him while he was in the hospital; and that Mr. Lemmons then told him that he could continue living in the bunkhouse until he was able to get around and that they were going to buy him an artificial limb and pay him for the one he lost and give him a job on the railroad, something he could handle; that after he got out of the hospital he went to Graham, Texas, and was living with his wife's mother and father; that on the 26th of Dec., he drove his car from Graham, Texas, to Wichita Falls (a distance of about 65 miles) and went to the Wichita Falls and Southern Railroad Depot and to Mr. Lemmons' office to see him.

This was his testimony as to the conversation then had:

"Q. And did you have a conversation with him? A. Yes, sir.

"Q. Would you please report to the Court and jury what that conversation

was? A. Well, I asked him had he thought about a settlement for my leg and he said no, he hadn't, and he asked me if I had thought about it and I told him no. Then he wanted to know if I had talked to an attorney. I told him no."

"Q. Had you? A. No, sir.

"Q. All right. What did he say then after you told him you had not talked to an attorney? A. Well, he said he hadn't either.

"Q. All right. What was stated then? A. Well, I asked him how much he thought it would be worth and he said he didn't have any idea. I told him I didn't either. And, he said—he asked me if—what would I take, and I told him well, I didn't hardly know, but wanted a job, and he said that he would give me a job, and I said, 'I will take six thousand dollars.'

"And his exact words, 'By God, I will give you the $6000 and a job.'

"Q. What kind of job? A. Life time job, anything I could—

"Q. Mr. Lemmons told that to you? A. And something I could do, work in the shop, they were aiming to move me to Wichita Falls and let me work in the shops.

"Q. Did you rely on that statement Mr. Lemmons made? A. I did.

"Q. Where did you all go then? A. We went to Mr. Humphrey's private office.

"Q. And that is where this release was drawn up? A. Yes, sir.

"Q. All right, when was the next time you came back then, after that time, to Wichita Falls to see Mr. Lemmons about this job? A. I didn't talk to Mr. Lemmons that day, he had had some work done on his teeth, and he sent me to Mr. Jernigan.

"Q. What was the nature of your conversation with Mr. Jernigan? A. He said he was going to fix the job for me." "I went back home and stayed there until about two weeks later, and I went back to Wichita Falls. And they said they had a job at Breckenridge, but they didn't think I could take it, there was too much walking in it."

"A. I told them I would try it, and they brought out a paper for me to sign, if I got hurt, crippled or killed, I wouldn't get anything out of it, or my

er additional damages for injuries suffered by him while in the employ of appellee.

Appellant pleaded: that, on or about November 25, 1951, while he was employed by appellee, he received personal injuries requiring the amputation of a foot; that on Dec. 26, 1951, he was induced by appellee's agent to execute a release of his claim for the sum of $6000, relying upon the promise of appellee's agent that he would receive in addition a lifetime job with appellee, which promise was fraudulently made in that appellee had no intention of employing appellant; and that he relied upon the representation of appellee's agent because of their relationship of trust and confidence, and appellee's superior knowledge of the law.

Appellee answered denying the invalidity of the release pleaded by the plaintiff in the twelfth paragraph of his complaint. Appellee pleaded that said release is binding and valid, that the plaintiff voluntarily agreed to a settlement and compromise of all claims arising out of the alleged injury for the sum of $6000 and the cost of an artificial foot, which said plaintiff received. Appellee further denied that there was any promise or representation to the plaintiff of a lifetime job and that there was no oral contract of any sort wherein the plaintiff was to receive a job for lifetime, and denied any fraudulent or false representations whatever as alleged, and denied that the sum paid was inadequate or unconscionable or that any relationship of trust or confidence existed between appellant and appellee.

Appellee further pleaded that in addition to the release a voucher was issued, duly endorsed and cashed by appellant reciting a full and complete settlement and satisfaction of said claim. A copy of the settlement agreement and release and a copy of the voucher were attached to the answer and made a part thereof.

Appellee filed a motion for separate trial on the issues raised in paragraph XII of the plaintiff's complaint.

On April 14, 1953, appellee's motion for a separate trial on the issue as to the validity of the release was granted.

On April 29, 1953, trial of the issue as to the validity of the settlement and release was heard before a jury. At the conclusion of the evidence, appellee filed a motion for a directed verdict stating therein the grounds therefor, and the trial court, for the reasons stated by him in his oral opinion,[3] granted the motion.

---

wife wouldn't get anything out of it, and I wouldn't take the job.

"Q. Did you find out what kind of job it was? A. Yes, sir.

"Q. What kind was it? A. They called it yard master, checking cars, and repairing.

"Q. Could a man with an artificial limb that you have, handle that kind of job? A. No, sir, he couldn't."

3. The Court:

"There are certain rules of law so well established that they are known even largely to the layman.

"For instance, a transfer of real estate by deed or by a lease even, for a longer period than one year, must be in writing. It is part of the old statute of fraud. Again, a promise to pay the other fellow's debt must be in writing.

"Almost up to the dignity of these two well known principles of law is the one that controls this case, and that is, when a man makes a contract, understandingly and knowingly, they are bound by that contract. When they sit down, or confer together, and after they have had their conference, reduce it to writing, all matters that they do not incorporate in the writing are presumed to have been abandoned, or never to have been mentioned.

"The rule is stated very aptly by Judge Ocie Speer, whom we all know, or did know in his lifetime, as one of the great lawyers and great judges of the State of Texas. Judge Speer not only has written many opinions, but he has written textbooks which are recognized as standard authority by the bar of the country.

"After speaking of a case of this character, all testimony by plaintiff relating to plaintiff's lack of knowledge of what was in the instrument, and that he would

Appealing from the judgment, plaintiff, citing many cases,[4] is here insisting that, under their teachings, his evidence entitled him to go to the jury, and that the district judge erred, in finding and holding that plaintiff was bound by, and could not contradict the recitals in, the release, and in instructing a verdict for defendant.

We agree with the appellant that this is so.[5] It is true that the defendant's testimony flatly contradicts that of plaintiff. But contradictions and conflicts in testimony are to be resolved not by the judge but by the jury. If the jury believed plaintiff's testimony: that defendant's manager gave him the promise of a job which he could handle, and, in reliance on that promise, plaintiff made the settlement and signed the release; and that when plaintiff applied for the job it was refused to him; it could have found that the promise of a job was made in fraud to induce plaintiff to sign the release but with no intention of performing it.

Because the district judge erred in directing a verdict, the judgment must be reversed and the cause remanded for further and not inconsistent proceedings.

not have signed it if he had known it had contained the provisions about employment, was objected to by the defendant, because it tendered to vary the terms of the instrument. The Court overruled the objection.

"This was a settlement for the same sum, it seems, $6000.

"Now, referring to this old rule, Judge Speer says, there is another rule as old as our jurisprudence to the effect that all oral agreements made prior to a writing will be presumed to have been merged into the written instrument subsequently executed. Especially is this true when, as in this case, the writing negatives the making of any oral agreement not embodied in the instrument.

"Our courts have not departed from this well established principle, analogous in many respects to the facts in the case before us, and the conclusions here expressed are those in another instance.

"We conclude that there was no competent evidence before the court that the fraud pleaded by the plaintiff in procuring the release in question, and that since

the instrument was complete and unambiguous, and negatives the absence of any agreement previously made, not embodied in the release, that no agreement for future employment had been made.

"In view of the law, as we think it is, we do not feel that any court, either the trial court or the appellate court, could permit a judgment to stand.

"Therefore, we will instruct the jury to return the verdict for the defendant."

4. Dice v. Akron, Canton & Youngstown R. Co., 342 U.S. 359, 72 S.Ct. 312, 96 L. Ed. 398; Graham v. Atchison T. & S. F. Ry. Co., 9 Cir., 176 F.2d 819; Irish v. Central Vermont Ry., 2 Cir., 164 F.2d 837; South Buffalo Ry. Co. v. Ahern, 344 U.S. 367, 73 S.Ct. 340, 97 L.Ed. 395; Southwestern Greyhound Lines, Inc. v. Buchanan, 5 Cir., 126 F.2d 179; Texas & N. O. Ry. Co. v. Thompson, Tex. Com.App., 12 S.W.2d 963; Texas & P. Ry. Co. v. Presley, 137 Tex. 232, 152 S. W.2d 1105.

5. Bates v. Southgate, 308 Mass. 170, 31 N.E.2d 551, 133 A.L.R. 1349.