Francis J. O'DAY, Plaintiff-Appellant,

v.

CHICAGO RIVER & INDIANA RAIL-
ROAD COMPANY, Defendant-
Appellee.

No. 11134.

United States Court of Appeals,
Seventh Circuit.

Oct. 19, 1954.

As Modified on Denial of Rehearing
Nov. 13, 1954.

Edward B. Henslee, Robert J. Kenney, John J. Naughton, Chicago, Ill., for appellant.

Marvin A. Jersild, Wayne M. Hoffman, Chicago, Ill., for appellee.

Before MAJOR, SWAIM and SCHNACKENBERG, Circuit Judges.

MAJOR, Circuit Judge.

This action was brought under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., to recover damages for personal injuries occasioned by the alleged negligence of defendant in failing to provide plaintiff with a reasonably safe place to work. After plaintiff rested his case, defendant made a motion for a directed verdict, which was renewed at the close of all the evidence. The court reserved its ruling on these motions. After the jury returned a verdict in plaintiff's favor, defendant made a motion for judgment notwithstanding the verdict, which the court sustained. From this adverse judgment plaintiff appeals.

Viewing the evidence in the light most favorable to the plaintiff, as we must, the most relevant facts are these. Plaintiff was 45 years of age at the time of the accident and had been in defendant's employ as a switchman and yard brakeman for approximately nine years. At about 8:30 p. m. on November 2, 1951, he was working with a three-man crew engaged in switching operations near the Magnus Metal Plant in Chicago. In this vicinity the spur track leading into that plant intersects the industry or lead track at a switch, commonly referred to in the record as the "No. 6 switch."

Photographs introduced into evidence show that the No. 6 switch is situated on the outside rail to the right of the lead track on two railroad ties which are about two feet longer than the other ties which support the rails. The railroad right-of-way is supported by a raised embankment covered with cinder ballast. To the right of the switch the embankment slopes downward eight or ten feet at a forty-five degree angle to a retaining wall where at that point there is a sheer drop of fifteen or twenty feet into an alley. The embankment for some time had been washed out for a distance of two feet underneath the switch ties, with the result that they protruded into the air with the ground receding below. The dirt and cinders underneath the switch ties had been loosened by the erosion. Consequently, in order to operate the hand switch it was necessary to stand on the sloping incline, face toward the lead track, crouch over and maintain a secure hold on the switch light on top of the switch.

When plaintiff's crew arrived at the plant, it was their duty to switch some cars from the lead track into the plant and to pull some cars out so they might be restored to road service. After about ten cars were recovered from this spur, plaintiff alighted from the switch engine and took up his position at this No. 6 switch, as he had been directed to do. Plaintiff had worked in this vicinity only several days, and had been warned earlier by the crew conductor of the dangerous condition existing around the switch.

During this time, some man living in one of the houses below the embankment shouted to plaintiff and to Snell, another crew member, to "quit making so much

noise." Plaintiff replied in effect that they would be "switching" for only a short while and that there was nothing they could do about the noise.

Plaintiff had taken his position and was bending over the switch when he noticed a man approaching him from the left, along the sloping embankment parallel to the right-of-way. This individual, whose identity the record does not disclose, was five or six feet from the switch when first discovered, and as it was dark at the time, plaintiff was unable to recognize him. Plaintiff, supposing the stranger was going to talk to him, straightened up suddenly, releasing his grip on the switch, and in so doing lost his balance due to the slope; his foot started to slide in the loose cinders and as he felt himself falling backwards he grabbed wildly for the man to break his fall. With both of his arms he began to pull the stranger down the incline with him. However, the man managed to pull one of his own arms free and struck plaintiff several times before both of them slid down the slope and over the retaining wall. Plaintiff landed on his face and head in the alley below and suffered rather serious injuries. By the time he regained consciousness, the other man had disappeared. Switchman Snell found plaintiff lying in the alley and aided by several others carried him to the caboose, and from there he was taken to the Mercy Hospital for treatment.

In his complaint plaintiff alleged that the perilous physical condition existing around the No. 6 switch was well known to defendant; that defendant was careless and negligent in not filling the switch in to eliminate the precarious footing, and that defendant was negligent in allowing such a dangerous condition to continue to exist. He concluded that the hazardous condition was the proximate cause of his injuries. Plaintiff was the only witness who personally knew anything about the actual events contributing to the accident. Only two other witnesses testified in plaintiff's behalf.

One was Michael V. Smalley, employed by defendant for twenty-six years, who testified as to the incline, that the switch ties jutted out and that the dirt wasn't even packed solid under the switch ties. He further testified that the area around the switch had been in the same condition for as long as he could remember. The other witness, Kenneth F. Stotz, was a physician who examined plaintiff some five months after the accident and who described in some detail the nature and extent of plaintiff's injuries.

At the trial defendant took sharp issue with plaintiff as to the actual cause of his injuries. It contended that he had become involved in a private argument with a trespasser who had knocked him off of the embankment, and that as a result there was no causal connection between the dangerous condition around the switch and the injuries. To substantiate its theory, defendant introduced the testimony of crewmen Busam and Snell and that of the company police officer Howard, who all testified to the alleged *res gestae* admissions made by plaintiff immediately following the accident in which he stated that he had been punched in the face and knocked off the embankment by an unknown assailant. This was coupled with the testimony of the treating physician, Dr. Claridge, who at the hospital took a personal history from plaintiff, in which he made substantially the same admission.

At the hearing on defendant's motion for a directed verdict at the close of all the evidence, the District Court said:

"Well, frankly, I think it is a very doubtful case of liability. However, I will reserve my ruling until the jury passes on it."

And at the subsequent hearing on defendant's motion for judgment notwithstanding the verdict, after the jury had returned its verdict for plaintiff, the court commented:

"Well, this Court is always reluctant to set aside the verdict of a jury, but in this particular case, I believe the Court would be deciding contrary to justice if it allowed this

verdict to stand. This Plaintiff's story was fantastic. He impressed the Court as anything but a truthful witness. He was very evasive, difficult to pin down on any statement of fact. The witnesses for the Defendant, on the contrary, impressed the Court as being truthful witnesses, and what basis the Jury had for their verdict is beyond the comprehension of this Court. As a matter of fact, it appears to the Court that their verdict was based on sympathy rather than on evidence. I think the verdict is so palpably contrary to the evidence that I can't see any basis for sustaining it. * * * As a matter of fact, I intended to direct a verdict at the close of all the evidence, but the Court was curious to see what the Jury would do, and for that reason alone the Court allowed it to go to the Jury, and it was a great surprise to the Court that they found issues for the Plaintiff, so the motion for a directed verdict notwithstanding the verdict of the jury is sustained."

The rule is well established that a motion for a judgment notwithstanding the verdict presents *only a question of law* as to whether, when all the evidence is considered together with all reasonable inferences most favorable to plaintiff, there is a total failure or lack of evidence to prove any necessary element of plaintiff's case. Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497; Sivert v. Pennsylvania R. Co., 7 Cir., 197 F.2d 371, 375; Marsh v. Illinois Central R. Co., 5 Cir., 175 F.2d 498, 499; Bonnier v. Chicago, B. & Q. R. Co., 2 Ill. 2d 606, 607–608, 119 N.E.2d 254. The Federal Employers' Liability Act makes a carrier liable in damages for any injury or death "resulting in whole or in part from the negligence" of any of its "officers, agents, or employees".

Therefore, the sole issue on this review is whether, considering all the facts and circumstances together with all reasonable inferences favorable to plaintiff, there was any evidence from which the jury could reasonably find defendant guilty of negligence which contributed in whole or in part to plaintiff's injury.

From the comments of the court previously shown, it appears that it substituted its own thoughts and judgment for those of the jury. The plain implication of the language used was that the court set aside the jury verdict solely because it chose not to believe the testimony of the plaintiff. The jury, however, was the judge of the credibility of the witnesses, not the court. Defendant's motions raised only a question of law as to whether or not there was any evidence which, if believed by the jury, would authorize their verdict. As was stated in Stanford v. Pennsylvania R. Co., 7 Cir., 171 F.2d 632, 634:

"If there was any evidence which, together with all the reasonable inferences that might be drawn therefrom, supports plaintiff's case, the trial judge erred in substituting his conclusions for those of the jury, since the jury is the tribunal to decide that type of issue. [Citing cases.] Only a complete absence of probative facts to support the conclusions reached would justify a court to substitute its conclusions for those of the jury. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916. This is so because the choice of conflicting versions of the way the accident happened, the decision as to which witness is telling the truth, and the inferences to be drawn from uncontroverted as well as controverted facts, are questions for the jury. Once there is a reasonable basis for concluding that there was negligence which caused the injury, it is irrelevant that fair minded men might reach a different conclusion. Otherwise it would be an invasion of the jury's function for the trial judge to draw contrary inferences or to conclude that a different conclusion would be more rea-

sonable. Ellis v. Union Pacific R. Co., 329 U.S. 649, 653, 67 S.Ct. 598, 91 L.Ed. 572."

Also in accord with our conclusion that the court below erred in refusing to accept the verdict of the jury is the case of Marsh v. Illinois Central R. Co., 5 Cir., 175 F.2d 498, 500. What we stated in the Stanford case, supra, disposes of defendant's suggestion that the verdict was based solely on inference, speculation and conjecture.

Defendant urges that there was no causal relation between the alleged negligence of defendant in improperly maintaining the area around the switch and plaintiff's injury. In the case of Eglsaer v. Scandrett, 7 Cir., 151 F.2d 562, 565, this court, after discussing the theory of proximate cause under the Federal Employers' Liability Act in the light of recent pronouncements by the Supreme Court, said:

"Under the old concept of proximate cause, that cause must have been direct, the complete, the responsible, the efficient cause of the injury. Contributing and remotely related causes were not sufficient. Now, if the negligence of the railroad has 'causal relation,'—if the injury or death resulted 'in part' from defendants' negligence, there is liability.

"The words 'in part' have enlarged the field or scope of proximate causes—in these railroad injury cases. These words suggest that there may be a plurality of causes, each of which is sufficient to permit a jury to assess a liability."

Under this view there was evidence, if believed by the jury, to the effect that the dangerous condition existing at the switch was the initiating cause of the injury, and this question of proximate causation was a question of fact for the jury. It is true that the parties were in violent disagreement as to the actual cause of the injury, but the jury presumably considered both versions and chose to accept plaintiff's.

Plaintiff strongly contends that the record contains the requisite evidentiary basis to support the verdict and we agree with this contention; at any rate, we cannot say as a matter of law that the evidence fails to establish a "reasonable basis" from which the jury could arrive at a verdict favorable to the plaintiff. There was evidence which showed that defendant was aware of the dangerous condition; that it knew that employees would be working in that vicinity; that it could have remedied the situation by filling in the ground around the switch; that it instead allowed such condition to exist for a long period of time, and that as a result such hazard did in fact contribute in whole or in part to plaintiff's injury. We reiterate what we said in Wetherbee v. Elgin, Joliet & Eastern Ry. Co., 7 Cir., 191 F.2d 302, 308:

"An appellate court may not reweigh the evidence * * * because the judges would draw different inferences * * * than the jury drew, or because they think that another result would be more reasonable. Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S. Ct. 409, 88 L.Ed. 520. 'Only where there is a complete absence of probative facts to support the conclusion reached does reversible error appear.' Lavender v. Kurn, 327 U. S. 645, 653, 66 S.Ct. 740, 744, 90 L. Ed. 916."

The judgment in favor of the defendant notwithstanding the verdict, is reversed, with directions that it be vacated, without prejudice, however, to the right of the District Court to rule upon defendant's motion for a new trial.