Emma **MARSHALL**, Administratrix of the Estate of Everett Marshall, Deceased, Plaintiff-Appellant,

v.

The **NEW YORK CENTRAL RAILROAD COMPANY**, Defendant-Appellee.

No. 11226.

United States Court of Appeals, Seventh Circuit.

Jan. 14, 1955.

William C. Wines, Errett O. Graham, John A. McElligott, Chicago, Ill., for appellant.

Wayne M. Hoffman, Marvin A. Jersild, Chicago, Ill., for appellee.

Before MAJOR, LINDLEY and SCHNACKENBERG, Circuit Judges.

MAJOR, Circuit Judge.

This action for damages was brought by Emma Marshall, administratrix of the estate of Everett Marshall, deceased, and was predicated upon the Federal Employers' Liability Act, Title 45 U.S.C.A. § 51 et seq. The damages sought to be recovered were those resulting from the death of Everett Marshall, husband of the plaintiff administratrix, while an employee of the defendant, The New York Central Railroad Company. Plaintiff's decedent was a section laborer and was injured on June 3, 1952, when a motor-car upon which he and other employees were riding was derailed as the result of a defective wheel. The decedent died the day following that on which he received his injuries. The accident happened near Elkhart, Indiana, and at that time decedent was 54 years of age. Of those designated as beneficiaries under the Act, the decedent left only his widow, the administratrix in the instant action.

The complaint contained allegations common to an action under the Federal Employers' Liability Act. Defendant by its answer made general denials of the material allegations and, in addition, pleaded the affirmative defense that the

plaintiff, on June 6, 1952, executed and delivered to defendant a release "whereby she forever released and discharged this defendant of any and all liability, claim and demand upon or growing out of the facts alleged in the complaint." A copy of the release showing receipt by plaintiff of $4,350.00 was attached to and made a part of the answer.

Plaintiff in her reply to this amended answer alleged that the release was obtained through the "fraud, connivance, and misrepresentation of the agents and representatives of the defendant." Four specific acts of fraud were enumerated in the answer, which we think may be fairly stated in abbreviated form as follows: that the payment of $4,350.00 was falsely represented to be an advance for funeral expenses and the payment of other bills; that the release was fraudulently represented to be a receipt; that defendant falsely informed plaintiff that it had investigated the accident in which her husband was injured and was unable to determine its cause, and that defendant's claim agents connived with attorney Cholis who pretended to represent and advise plaintiff as her attorney when as a matter of fact he was not, and that he advised her falsely as to her rights as well as to the liabilities of the defendant.

The cause was tried to a jury, and at the close of plaintiff's case the court, on defendant's motion, directed a verdict in favor of the defendant and entered its judgment accordingly. The ruling was based solely upon the conclusion that plaintiff's proof was insufficient to raise a submissible issue on the question of fraud. From the judgment thus entered plaintiff appeals.

▆▆▆▆ Thus, the sole issue here is whether the court erred in directing a verdict on the issue of fraud or, to state the issue in different words, whether the court erred in its refusal to submit the fraud issue to the jury. The District Judge stated and the defendant concedes that the proof was sufficient on all other issues to take the case to the jury.

The only testimony offered relative to the issue for decision was that of Emma Marshall, the plaintiff administratrix and widow of the decedent. Her testimony as to the circumstances which preceded as well as those attendant upon the execution of the release covers some sixty pages of the printed record. A reading of this testimony reveals considerable confusion, as well as inconsistencies and contradictions. Defendant complains that plaintiff in her brief has selected portions of this testimony favorable to her and ignored that which is contrary and conflicting. That plaintiff has done so is evident but, at the same time, we think it permissible in view of the limited issue for decision. Certainly all must agree that it is not the province of this court, neither was it that of the District Court, to weigh and evaluate any conflicts or contradictions in plaintiff's testimony. That is peculiarly the function of a jury. Plaintiff was and is entitled to have her testimony, together with all reasonable inferences arising therefrom, considered in the light most favorable to her. Defendant's motion raised only a question of law as to whether there was any evidence which, if believed by the jury, would have authorized a finding in her favor on the issue of fraud. See O'Day v. Chicago River & Indiana Railroad Co., 7 Cir., 216 F.2d 79, and cases therein cited.

Plaintiff at the time of the trial was 54 years of age and had been married to the decedent since 1950. Her schooling consisted of a seventh grade education and she had had no experience in business. As stated, the decedent was injured June 3, 1952, and died the following day. On the date of his death, defendant's claim agent, Mr. W. A. Smith, called on plaintiff at her home. She testified that she was "in terrible grief" and that Smith told her "he was there to help me in whatsoever my needs would be and that he was there to see about putting my husband away, and things like that." She was interrogated and answered as follows:

"Q. What did you tell him you needed? A. He said he was there to let me have money which you need for the paying off on bills, for to bury my husband and things like that.

"Q. What did you tell him you needed? A. He said he would rather pay off a claim.

"Q. Did you discuss what you would need? A. I told him that I would accept ten thousand dollars. He said he would not pay that much.

"Q. Did he tell you what he would do for you? A. He told me he would give me two thousand dollars.

"Q. Did he tell you on what basis he would give that to you? A. To take care of expenses. He said I need not worry about expenses.

"Q. And did he tell you, or did you tell him what the expenses would be? A. No, because I didn't know.

"Q. Did you discuss with him what expenses you already had? A. I told him I wanted to take my husband back to Cape Girardeau where he requested to go.

"Q. What was the reason for taking him back there? A. Because that was his request."

Either in the same conversation or in another conversation on the same day, Smith suggested paying her $3,000.00, and she told him that her claim would be $10,000.00. Smith stated "he wouldn't pay it." On June 6, Smith took plaintiff to the office of attorney Cholis in South Bend, Indiana. She was accompanied to that office by her brother-in-law, Dan Marshall, by Mr. Smith and by Mr. Stewart, another of defendant's claim agents. Cholis was not employed by plaintiff as her attorney, and to her knowledge she never paid him any fee; in fact, she did not know that he was a lawyer or that the office to which she was taken was a law office. While in this office Cholis presented plaintiff with a number of papers to sign, including a petition to be filed in the local Probate Court for the issuance of letters of administration, a petition setting forth the circumstances of the accident causing decedent's death as the basis for obtaining an order from the Probate Court approving the settlement. Also, while in this office, she signed as administratrix of decedent's estate the release pleaded by defendant as a bar to the action. This release recited a consideration of $4,350.00, and above her signature, in her own handwriting stated, "I have read and understand this release."

Plaintiff's testimony as to what transpired in this office is in part as follows:

"Q. What was the conversation when you went into Mr. Cholis' office? A. Well, when I went in there, I sit down to the desk, and he presented me with some papers, you know. He said he had some receipts he wanted me to sign in order that they could pay me the money that I asked for.

"Q. And were Mr. Smith and Mr. Stewart in there, in and about at that time? A. Yes, they was in and out."

Plaintiff admitted her signature on the release, as well as on other papers, and also acknowledged that the written statement in the release was in her handwriting. Her testimony continued:

"Q. Now, before this was presented to you, did you read it? Before you signed it did you read it? A. No, I didn't because I couldn't see it. I didn't have my glasses.

"Q. What did you do with it? A. I take and looked at it, and I told him I couldn't see hardly to read it, and give it back to him.

"Q. What was done with it after you gave it back to him? A. Not anything but he read a few paragraphs, but I don't remember what it was.

"Q. Did you know at the time what the content of this was from his reading it? A. No, I didn't understand it.

"Q. Was there a conversation about how much money you were going to get? A. Yes.

"Q. What was the conversation? A. They said they would give me the $4,000.00 to cover expenses, that would cover expenses."

Plaintiff identified her signature on the back of the voucher for $4,350.00. It appears that this voucher was taken to the bank located on the first floor beneath the law office, that someone connected with the bank brought the cash up to Cholis' office where $4,000.00 was paid to her in cash, of which amount she, on the advice of Cholis, deposited $2,-600.00 in a savings account in the bank. (The record does not reveal what became of $350.00, the difference between the amount named in the voucher and that which plaintiff testified she received in cash.)

Plaintiff testified that she did not know that Cholis was representing her or what he was doing in connection with the transaction. She testified that Dan Marshall was in the office at the time she signed the papers and that they were handed to him to read but that he did not do so because he could not read. (Dan Marshall was a section hand and had even less schooling than plaintiff.) Prior to the time she received $4,000.00 in cash, plaintiff and her brother-in-law left the attorney's office and went to the undertaking parlor to ascertain the amount of the funeral expenses. She testified that she was told by Cholis "that those papers you signed were receipts for money he gave me." She also testified:

"Q. Was anything said to you about, concerning the hiring of any lawyer for you? A. No.

"Q. By Mr. Smith or by anybody else? A. No. Mr. Smith's continuous instruction to me was don't let anybody tell me that I needed a lawyer, because they was going to deal fair with me.

"Q. Did Mr. Smith tell you, or did you know that Mr. Cholis was a lawyer? A. No, I did not.

"Q. Did you know at any time that you were being asked to settle your claim in full for $4,000.00 or any other sum less than $10,000.00? A. I did not."

Plaintiff further stated that she was told by the claim agent that the papers which she had signed did not completely release her from the railroad.

■ Admittedly, this sketchy outline of plaintiff's testimony includes that which is most favorable to her, and evidence upon which defendant relies as contradictory is in the main omitted. But, as stated, plaintiff on the motion to direct a verdict was entitled to have the testimony considered in the light most favorable to her. Thus, in summary, we have a situation where the testimony, if believed, shows that plaintiff, a woman of little education, while in a grief stricken condition was beset by defendant's claim agents and a settlement made of all of defendant's liability for an amount much less than she demanded, all prior to decedent's burial. More than that, the effectuation of this alleged settlement was accomplished through the services of a lawyer selected by the defendant, who was an entire stranger to the plaintiff. Plaintiff signed a release on the representation that it was a receipt and thought she was being paid money for expenses, without any intention of releasing the defendant from liability.

A study of the cases where reviewing courts have considered the question for decision leads us to the conclusion that a submissible issue was presented and that the court erred in directing a verdict.

In Dice v. Akron, Canton & Youngstown Railroad Co., 342 U.S. 359, 72 S.Ct. 312, the Supreme Court held that in an action under the Federal Employers' Liability Act the question of the validity of a release granted to the carrier by

the injured employee is to be determined by federal rather than state law. There, the injured employee signed the purported release on the representation that the document was a receipt for back wages. The court held that the trial court committed error in directing a verdict for the defendant and in so doing stated, 342 U.S. at page 362, 72 S.Ct. at page 314:

> " * * * a release of rights under the Act is void when the employee is induced to sign it by the deliberately false and material statements of the railroad's authorized representatives made to deceive the employee as to the contents of the release."

In every case of which we are aware, decided in recent times and involving the question of the validity of a release from liability under the Federal Employers' Liability Act, a directed verdict in favor of the defendant, a summary judgment in favor of the defendant or a judgment notwithstanding the verdict, has been reversed. Irish v. Central Vermont Ry., Inc., 2 Cir., 164 F.2d 837; Graham v. Atchison, T. & S. F. Ry. Co., 9 Cir., 176 F.2d 819; Purvis v. Pennsylvania R. Co., 3 Cir., 198 F.2d 631; Camerlin v. New York Cent. R. Co., 1 Cir., 199 F.2d 698; Gifford v. Wichita Falls & S. Ry. Co., 5 Cir., 211 F.2d 494. See also Gill v. Seaboard Air Line R. Co., 4 Cir., 208 F.2d 7, 12.

No good purpose could be served in more than a brief comment on these cases. In the Irish case, the plaintiff testified that he signed the release on the promise of the defendant's agent that the latter would obtain him more money in the form of a pension. The court stated in 164 F.2d at page 839:

> "If the jury believed the evidence of the plaintiff, it could have found that the claim agent made the promise. It needed no more than belief in the truthfulness of the plaintiff's testimony to find that he reasonably understood, and that the claim agent knew he understood, that the agent

was going to try to persuade the railroad to grant him a pension."

In the Graham case, plaintiff executed the release, according to his testimony, under a mistaken belief as to the extent of his injuries. The court held that testimony of this mistaken belief was sufficient to require a submission to the jury of the question of the validity of the release. In the Purvis case, plaintiff testified in effect that he did not understand the contents of the release. The court held that his testimony presented a jury question. In the Camerlin case, plaintiff by deposition testified that he signed the release on the representation of the claim agent that he was only entitled to recover compensation under the New York law. There, as in the instant case, the claimant wrote into the purported release, "I have read and understand this release." The court, in reversing a summary judgment in favor of the defendant, stated in 199 F.2d at page 704:

> "But we do not think that the plaintiff's version of the facts, as told in his deposition, is so inherently incredible that no reasonable jury could credit his testimony."

In the Gifford case, plaintiff executed a release of his claim for the sum of $6,-000.00, relying upon a promise which the carrier failed to perform, that he would receive in addition a lifetime job. The court, in reversing a directed verdict, stated in 211 F.2d at page 497:

> "It is true that the defendant's testimony flatly contradicts that of plaintiff. But contradictions and conflicts in testimony are to be resolved not by the judge but by the jury."

While we realize that each case must stand upon its own peculiar facts, we think these cases clearly demonstrate that the testimony in the instant case was as favorable to submission of the issue as to the validity of the release as it was in most, if not all, of the cases cited. And these cases further demonstrate that reviewing courts have care-

fully scrutinized releases such as here involved, to make sure that they are untainted by fraud or overreaching. See also South Buffalo Railway Co. v. Ahern, 344 U.S. 367, 372, 73 S.Ct. 340, 97 L.Ed 395.

██ Defendant argues, not too seriously, that plaintiff as a prerequisite to her right to maintain the action was bound to make restitution of the amount which she received. Under circumstances similar to those here, it has been held to the contrary, and we think correctly. Irish v. Central Vermont Ry., Inc., 2 Cir., 164 F.2d 837, 840; Graham v. Atchison T. & S. F. Ry. Co., 9 Cir., 176 F.2d 819, 826. See also Indiana, Decatur & Western Railway Co. v. Fowler, 201 Ill. 152, 66 N.E. 394, and Johnson v. Elgin, Joliet & Eastern Ry. Co., 338 Ill.App. 316, 87 N.E.2d 567.

A vexatious problem arises with respect to the proceedings in the Probate Court of St. Joseph County, Indiana. Defendant argues that plaintiff should not be permitted to contend that such proceedings were a fraud upon her and at the same time rely upon the letters of administration issued by that court. All the exhibits pertaining to the probate proceeding, together with the circumstances attending their execution, were offered by the plaintiff supposedly on the theory that their execution and filing in the Probate Court was a part of the fraud perpetrated upon her. The order of the Probate Court authorizing the alleged settlement was offered for the same purpose. Obviously, this order was not offered by the plaintiff for the purpose of showing that the settlement and release in question were valid. Neither was this order of the Probate Court relied upon by the defendant in its pleading as a bar to the action. Sole reliance was placed upon the release executed in attorney Cholis' office.

██ We need not cite authority for the proposition that an action for death under the Federal Employers' Liability Act can be maintained only by an administrator. It has been held, however, and we think correctly, that a Probate Court is without jurisdiction over such a claim because any recovery is not for the benefit of the estate but only for the beneficiaries designated in the federal Act. Southern Ry. Co. v. Stewart, 8 Cir., 115 F.2d 317, 321. It appears that defendant by its failure to plead the order of the Probate Court recognized this as the rule. But while the Probate Court did not have jurisdiction to enter an order authorizing a settlement, it did have jurisdiction to issue letters of administration. As heretofore shown, the probate proceedings were initiated by the defendant, or by an attorney selected by it, under circumstances asserted to have been a fraud upon the plaintiff. Defendant's contention, if sustained, would permit it to take advantage of its own wrong. In our judgment, defendant is estopped under the circumstances from making an attack upon plaintiff's letters of administration which were issued at its request by a court having jurisdiction.

The judgment appealed from is reversed and the cause remanded.