See also, 24 F.R.D. 457.

---

**John TAXIN and Bernard Taxin, trading as John Taxin Co.,**

v.

**FOOD FAIR STORES, INC., et al.**

**Civ. A. No. 26967.**

United States District Court
E. D. Pennsylvania.

Feb. 18, 1960.

Lester J. Schaffer, Philadelphia, Pa. (Zink, Shinehouse & Holmes, Philadelphia, Pa.), for plaintiffs.

Harold E. Kohn (Dilworth, Paxson, Kalish, Kohn & Dilks) Philadelphia, Pa., for defendants Samuel P. Mandell Co., etc.

Harry Shapiro, Philadelphia, Pa., for Food Fair Stores.

WOOD, District Judge.

Plaintiffs, John and Bernard Taxin, trading as John Taxin Company, hereinafter referred to as Taxin, commenced this action on September 11, 1959 against Food Fair Stores, Inc., hereinafter referred to as Food Fair, and various other

corporations and certain of their officers, including Samuel P. Mandell Co., Inc., Mandell Distributing Co., Inc., and Samuel P. Mandell, individually, alleging that defendants have violated the antitrust laws in the fruit and produce distribution business by means of a conspiracy in restraint of trade and commerce beginning in 1949.

The answers of all of the defendants deny any violation of the antitrust laws and affirmatively plead that all of the claims in the complaint are barred by a release executed by plaintiffs in favor of defendants on March 28, 1958. Defendants also plead that the Federal Statute of Limitations pertaining to civil actions under the antitrust laws bars all claims going back more than four years prior to the filing of the action (15 U.S.C.A. § 15b).

Plaintiffs, pursuant to leave granted by the Court under Rule 7(a), 28 U.S.C.A., have filed a reply to these affirmative defenses admitting execution of the release but in substance alleging that plaintiffs were induced to sign the release by reason of representations of certain of the individual defendants that Food Fair would purchase from plaintiffs a minimum of $500,000 worth of fruit and produce per year and that plaintiffs would have to rely on the good faith of the defendants to perform, since no written agreement setting forth the terms could or would be entered into. The reply further alleges that defendants never intended to carry out the promises made to plaintiffs and thereby fraudulently induced execution of the release. It also alleges that the release was obtained by defendants in furtherance of the conspiracy charged in the complaint. Finally the reply alleges that but for the fraud suit would have been started in November, 1957, which would have affected the Statute of Limitations.

Mandell filed this motion for Summary Judgment on November 19, 1959 on the ground that the pleadings together with the depositions of the plaintiffs, John and Bernard Taxin, the deposition exhibits, and the affidavits establish that there is no genuine issue as to any material fact on the effect of the release to bar all claims in the complaint as to them. They also argue that the Statute of Limitations bars all claims more than four years old at the time of the filing of this action. In the alternative, requests have been made of the Court to the extent that any genuine issue of fact might be found to exist to hold a separate trial in equity on such issue under Rule 42(b). Pending the determination of the motion for Summary Judgment by Mandell, the Court ordered a separate trial of the release issue as to all defendants on December 14, 1959, and thereafter argument was held and briefs submitted in support of and in opposition to the motion for Summary Judgment which is now before us for disposition.

It must be borne in mind that the issue here is between Taxin and Mandell and as between them there does not appear to be any difference of opinion as to the circumstances leading up to the ultimate execution of the release on March 28, 1958. Prior to February 5, 1958, some or all of these defendants had been threatened with a similar action on behalf of Taxin. Between October, 1957, and February 5, 1958, Taxin, through his attorney, had been negotiating independently with Mandell and Food Fair in an attempt to negotiate their differences. On February 6, 1958, Taxin reported to his counsel in the proceedings that on February 5, 1958, he had had a meeting with representatives of Food Fair in which Mandell did not participate, and at that meeting certain representations were made to him as to future business between Taxin and Food Fair but that these agreements could not be included in the release agreement. Nevertheless, on February 7, 1958, the attorney for Taxin wrote to the attorney for Food Fair confirming by letter his understanding of the meeting of February 5 as related to him by his client and suggesting that the consideration for the release be in the sum of $25,000. Immediately thereafter the attorney for Food Fair phoned the attorney for Taxin and stated.

that the letter was a breach of the understanding and that the letter should be destroyed. Thereafter, on February 13, 1958, the attorney for Taxin received a letter from the attorney for Food Fair, dated February 11, 1958, specifically and definitely denying that any such promises as contained in the letter of February 7 had been made and further stating: "If the offer contained in your letter of February 7 is based upon the assumption that these promises were made and upon reliance that those alleged promises will be carried out then the offer cannot be accepted." It will be noted that the affidavits referred to and the two letters do not charge Mandell with having made any misrepresentations whatever. The affidavit of John Taxin filed in support of the position taken by plaintiffs corroborates the aforesaid facts but specifically makes no reference to any statements or misrepresentations made on behalf of Mandell. We have no further documentary evidence, but we assume that there were negotiations leading up to the ultimate execution of the release on March 28, 1958. An examination of the depositions clearly discloses that no representations or misrepresentations other than appear in the release itself were made by Mandell between February 10 and March 28, 1958. On the contrary, it appears, taking the situation in the light most favorable to the plaintiff, that Mandell made no fraudulent misrepresentations at any time during these negotiations.

Counsel for plaintiffs says, notwithstanding the above facts, that a conspiracy existed prior to the entry of these negotiations in which Mandell and Food Fair were co-conspirators; that the obtaining of the release was a part of this general conspiracy and that Food Fair acted fraudulently and that therefore the release is ineffective as far as Mandell is concerned. He states in his brief at page 11: "The fact that Mandell defendants did not personally make any fraudulent misrepresentation is of no moment in view of the conspiracy charge. No citation of authority is necessary to establish that a conspirator is responsible for the acts of his co-conspirators."

Both parties admit that the terms of the release if valid are binding. Releases of private antitrust claims are legal and are in accord with public policy.[1] Absent the "part and parcel of the conspiracy" charge, we look first to see whether there is any material fact which should go to a jury to determine the validity of the release as between Mandell and Taxin and to determine that we look to the Federal law,[2] although both parties agree that there is not substantial difference between the Pennsylvania law and the Federal law, and both parties rely largely on the Bardwell case[3] which they agree best explains Pennsylvania law on this subject. We find the Federal cases more favorable to plaintiffs, but we also find them distinguishable from the case at bar.

The legal problem has arisen frequently in Federal cases particularly under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., where claimants have executed releases and have alleged that a promise to do something in the future, beyond the written terms of the release, was made but never carried out. Where fraud is alleged, under such circumstances, the Courts have held that it is a question for a jury. In Dice v. Akron, Canton and Youngstown Railroad Co., 1952, 342 U.S. 359, 72 S.Ct. 312, 314, 96 L.Ed. 398, the Supreme Court of the United States held that in an ac-

1. "It is well settled that injury and damage to a private party resulting from violations of the antitrust laws is a tortious act. The allegedly injured party may compromise a cause of action based on such a claim in the same manner as any other tortious act may be compromised and settled." Solar Electric Corp. v. General Electric Co., D.C.W.D.Pa.1957, 156 F.Supp. 51, 58.

2. United States ex rel. Marcus v. Hess, 3 Cir., 1946, 154 F.2d 291; and Panichella v. Pa. Railroad Co., 3 Cir., 1959, 268 F.2d 72.

3. Bardwell v. Willis Co., 1953, 375 Pa. 503, 100 A.2d 102.

tion under the Federal Employers Liability Act the question of the validity of a release granted to the carrier by the injured employee is to be determined by Federal rather than State law. In that case the Court stated:

"A release of rights under the Act is void when the employee is induced to sign it by the deliberately false and material statements of the railroad's authorized representatives made to deceive the employee as to the contents of the release."

The Dice case was cited in the case of Marshall v. New York Central Railroad Co., 7 Cir., 1955, 218 F.2d 900. The Court in the Marshall case held that the question of whether the release was procured by fraud was a question for the jury. The Court also cited with approval a case relied on by Taxin. Gifford v. Wichita Falls & Southern Ry. Co., 5 Cir., 1954, 211 F.2d 494. These cases and those cited therein present the strongest possible argument in favor of plaintiffs who seek to avoid the release here. We note some differences, however, in the factual situation there than in the matter we must decide. In the leading cases cited, the issue was always under the Federal Employers Liability Act and there was always a claim by an employee which had been settled under most unusual circumstances and in which the employee, generally not represented by counsel and unaware of his rights, had executed a release on the promise of the claim agent or other representative of the employer to do some act for him in the future (such as in the Wichita case, or where the releasor was an ignorant person and had no clear understanding of her rights, as in the Marshall case). More important, however, is the fact that in each of these cases a definite misrepresentation was alleged and proven. In our case there is absolutely no evidence insofar as the affidavits or depositions are concerned to show that at any time Mandell made any misrepresentation whatever, nor is there any allegation that plaintiffs relied on Mandell doing anything in the future, although they may have alleged that they relied on things which Food Fair agreed to do in the future. Since, as we have said, both parties seem to rely on the Bardwell case, in which Mr. Justice Bell said:

"Fraudulent misrepresentations may be proved to modify or avoid a written contract if it is averred and proved that *they were omitted* from the (complete) written contract by fraud, accident or mistake * * *" (375 Pa. at page 507, 100 A.2d at page 104)

we comment briefly on it. Also, plaintiff in support of his position under the Bardwell case cites In re Boyd's Estate, 1958, 394 Pa. 225, 146 A.2d 816, in which the Court said:

" * * * If the written agreement was intended by the parties to encompass the matter in dispute, then evidence of a contrary nature based upon an oral agreement at the time of the execution of the written agreement was barred in the absence of fraud, accident or mistake * * *" (394 Pa. at pages 232, 233, 146 A.2d at page 820).

The Bardwell and Boyd's Estate cases involve the Pennsylvania Parol Evidence rule. The Marshall and Wichita cases were decided after conflicting testimony had been taken, but the basic issue is the same, and Mandell has avoided liability under both standards. Can this plaintiff avoid an admittedly binding release when all of the evidence available clearly shows that Mandell made no misrepresentations, and when the documentary evidence involved clearly indicates that both parties involved in the actual misrepresentations, that is to say, Food Fair and plaintiff, mutually agreed that the alleged oral promise should be kept out of the written agreement? (This agreement was set forth in the affidavit of John Taxin.) Certainly there was no accident or mistake, and if there were fraudulent misrepresentations made which were relied on to the detriment of the plaintiffs, and which there was no intention to keep in the future on the part of the promisor, then admittedly Mandell

neither made any such misrepresentations, nor can we find that he failed to do something in the future which he never promised to do in the first place. We are bound by the record before us and we have searched arduously but in vain to find some fact material to this allegation of fraud which could be submitted to a jury.[4]

■ This brings us then to the claim that the release was "part and parcel of the conspiracy" and that if there is a factual question which Food Fair could be held to answer (although we do not pass on that question at this time) then Mandell could also be held because it is alleged that he was originally a co-conspirator with Food Fair. As previously stated, neither counsel has been able to cite any authority on this problem nor have we been able to find an applicable decision. In the absence of any fact in the proceedings thus far to show that Mandell conspired with Food Fair in actually obtaining the release or in the absence of any fact to show that he knew or should have known that fraudulent misrepresentations were being made by Food Fair, or in the absence of any proof that he was a third-party beneficiary of this contract of release and having paid good consideration[5] therefor, we must hold that he is entitled to the benefit of the release and that the plaintiffs as to him are bound by the terms thereof. To hold otherwise, we believe, would mean that in any case in which a group of conspirators were involved in an antitrust case none could obtain a valid, binding release if one of the conspirators obtained a release by fraud. This, it is submitted, would not only be contrary to the law but contrary to public policy.

In view of our findings here, it is unnecessary to pass on the question as to the applicability of the Statute of Limitations raised by the movant.

Our decision here involves a controlling question of law as to which there is substantial ground for a difference of opinion and an immediate appeal from the order may materially advance the ultimate termination of the litigation.

### Order

And now, to wit, this 18th day of February, 1960, it is hereby ordered that Summary Judgment in favor of defendants Samuel P. Mandell Co., Inc., Mandell Distributing Co., Inc. and Samuel P. Mandell is granted as to that part of plaintiffs' claim based upon events occurring up to and including March 28, 1958.

4. Combined Bronx Amusements, Inc. v. Warner Bros. Pictures, Inc., D.C.S.D. N.Y.1955, 132 F.Supp. 921. And see Suckow Borax Mines Consolidated, Inc. v. Borax Consolidated, Ltd., 9 Cir., 1950, 185 F.2d 196, certiorari denied 340 U.S. 943, 71 S.Ct. 506, 95 L.Ed. 680; Duffy Theatres, Inc. v. Griffith Consolidated Theatres, 10 Cir., 1953, 208 F.2d 316.

5. Mandell paid $12,000 of the $18,000 total paid for the release.