**FOX MIDWEST THEATRES, Inc., et al., Appellants,**

v.

**Jay MEANS et al., Appellees.**

**No. 15068.**

United States Court of Appeals, Eighth Circuit.

March 29, 1955.

James C. Wilson, Kansas City, Mo. (Colvin A. Peterson, Jr., and Watson, Ess, Marshall & Enggas, Kansas City, Mo., with him on the brief), for appellants Paramount Film Distributing Corp., et al.

Joseph J. Kelly, Jr., Kansas City, Mo. (Spencer, Fane, Britt & Browne, Kansas City, Mo., with him on the brief), for appellant Fox Midwest Theatres, Inc.

Nick C. Spanos, Los Angeles, Cal., and Wm. G. Boatright, Kansas City, Mo., submitted brief for appellees.

Before SANBORN, JOHNSEN and COLLET, Circuit Judges.

JOHNSEN, Circuit Judge.

Appellees are the owners and operators of the Oak Park Theatre, located at 3935 Prospect Avenue, in Kansas City, Missouri.

In 1951, they had made claim and threatened suit against the eight major film producers of the country, the producers' subsidiary distributing corporations, and the Fox Midwest Theatres, Inc., an exhibitor, operating several theatres in Kansas City, and being owned and controlled by one of the producers and distributors. The alleged basis of the claim made was that all of the parties referred to had been engaged in an illegal combination and conspiracy in restraint of trade, affecting appellees in their operation of the Oak Park Theatre, violative of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1 and 2, and following the pattern of that involved in United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, with the decree conforming thereto in D.C.S.D.N.Y., 85 F.Supp. 881.

Copy of the complaint prepared for filing was furnished by appellees to all of the parties, and negotiations for settlement began, with the object of avoiding an actual suit, if possible. The gist of the particular wrong done appellees, as set out in the prepared complaint, was that the charged parties had combinationally placed and kept the Oak Park Theatre in an artificial and inferior film-playing position in relation to the exhibiting operations of Fox Midwest Theatres, Inc. in Kansas City, and had also conspiratorily acted together to cause appellees to pay excessive and improper rentals for such films as were supplied to the Oak Park Theatre, even in its unnaturally-accorded, third-run status. The complaint made request for damages and an injunction, under sections 4 and 16 respectively of the Clayton Act, 15 U.S.C.A. §§ 15, 26.

A compromise settlement was ultimately arrived at, under which the sum of $100,000 was paid to appellees by all of the parties jointly, and a release was taken by them from appellees. The release contained a general perambulatory recitation that appellees were claiming that they had suffered damage and injury to their property and business from alleged violation of the Sherman Act and the Clayton Act by the paying parties and had threatened to file suit on account thereof; that these parties all denied "the allegations and assertions and contentions" made by appellees; and that the parties, "to avoid prolonged litigation, controversy and expense have agreed upon a basis of compromise and settlement"—with the agreement arrived at purporting to be set out immediately following, in four numbered paragraphs.

Only paragraphs numbers 1 and 3 of the written instrument (which was captioned "Release") are here material. They provided:

"1. In consideration of the sum of One Hundred Thousand and No/100 Dollars ($100,000.00) in hand received by the said Jay Means and Wilma Means [the appellees here] from the aforesaid defendants, said Jay Means and Wilma Means, individually and collectively, hereby compromise, settle and forever discharge the aforesaid defendants from any

and all causes of action, claims and demands whatsoever, whether at law or in equity, that they now have against the said defendants, and any of them, by reason of the alleged unlawful acts, contracts, combinations, conspiracies and restraint of trade, monopoly or attempt of monopoly, in violation of said acts, and every other matter whatsoever, including all claims for damages and damages, attorneys' fees, costs and expenses, and all claims for damages by reason of violation or claimed violation of the antitrust laws and amendments thereto of the United States and of any state and all claims for damages which have accrued or are claimed to have accrued prior to the date hereof."

"3. Nothing herein shall be construed as releasing or affecting any rights Jay Means and Wilma Means may have as to run, clearance or playing position of the Oak Park Theatre in the future."

Paragraph numbers 2 and 4—the only other contractual paragraphs in the settlement agreement—merely provided, respectively, that appellees warranted that they were the sole persons entitled to assert the claims involved or having any right or interest therein, and that they further warranted that the lawyer representing them in the settlement negotiations was the only attorney they had employed, and that they had been fully advised regarding their rights and in relation to the execution of the release by them. These paragraphs have no immediate relevance to and throw no contextual light upon the intended significance or legal consequence of paragraphs numbers 1 and 3, around which the dispute that is here involved centers, and they need accordingly not be referred to further.

In 1952, approximately a year after the settlement was made, appellees brought suit against all of the parties, claiming that they had breached a part of the accord and terms reached between them, in that, under the settlement as made, there had been a specific agreement that the Oak Park Theatre would thereafter be offered the pictures of all the producers for exhibiting purposes, on a second-run basis, and without having to bid therefor against any theatre operated by Fox Midwest Theatres, Inc.; that the Oak Park Theatre should only have to bid against any independently-owned theatres which might be located in its regular playing-and-clearance zone; that, notwithstanding this agreement on the part of the producers, and distributors, and Fox Midwest Theatres, Inc., some of them had, within a short time after the making of the settlement, commenced to allow Fox Midwest Theatres, Inc., to make purported bids against appellees for films to be exhibited in Fox's Linwood Theatre, which was located in the same general playing zone as the Oak Park Theatre, but which up to that time had never been engaged in second-run exhibition but in third-run only; and that as a result of these acts appellees had been deprived of films which they desired and would otherwise have shown in the Oak Park Theatre, and had also had to pay higher rentals for such films as they obtained, in consequence of all of which they had suffered substantial pecuniary loss and damage.

The complaint prayed for a declaration that such an agreement as alleged had in fact been entered into and constituted part of the general settlement made. It further asked for a determination of the amount of damages sustained by appellees on account of the breach and for an injunction against further violation. The court, on a trial without a jury, found and declared the existence of such an agreement, as claimed by appellees, and granted damages and an injunction in relation thereto.

The principal attack made by appellants upon the judgment here is that the evidence offered by appellees to demonstrate the existence of these claimed terms in relation to the settlement made, and received by the trial court for that purpose over appellants' objection, was incompetent under the parol evidence rule, and that hence there existed no proper basis on which to support the findings made and the judgment entered. Primarily, the contention is that the ex-

pression contained in paragraph number 1 of the settlement agreement or release, set out above, as to the $100,000 payment made, could not legally be read as representing a mere description, recital or form of receipt as to some element of consideration that had been involved, but that on its face and from the effect of its language it was required to be regarded as having contractual nature and force in the instrument, or in other words as constituting such a complete, written embodiment of the considerational terms of the settlement as to preclude extrinsic proof of the existence of any additional agreement term in that field, such as appellees in effect were attempting to establish.

■ The rule recognized by the Missouri courts, as well as generally, has been typically stated in Pile v. Bright, 156 Mo.App. 301, 137 S.W. 1017, 1018, as follows: "There has been some variation between the early and later cases in this state upon the question of explaining, or contradicting by parol, an expressed consideration of a written contract, but the law is now well settled that when the recital of a consideration in a written contract can be fairly regarded as a mere recital, or a statement of the receipt of money, then such recital may be explained by parol, and the actual consideration for the contract shown even though to do so may apparently contradict the recital in the contract. In this class of cases the recital as to the consideration is regarded in the same light as a receipt for money and may be explained, or even contradicted by parol; but, if the statement in a written contract in relation to the consideration shows upon its face that the expressed consideration is a part of the terms of the contract itself, then that part of the writing stands as any other part, and it cannot be contradicted, added to, nor subtracted from, by parol."

When extrinsic evidence was first undertaken to be introduced by appellees to show the existence of such terms as they claimed had been made regarding the future playing-position of the Oak Park Theatre and its right to be free from competitive bidding on the part of Fox Midwest Theatres, Inc., appellants made objection on the ground that such proof was violative of the parol evidence rule. The court stated at that time that, without more of the situation before it than appeared on the face of the instrument, it was not able to say momentarily "whether the evidence would undertake to vary the terms of that settlement." Thus, it pointed out that the evidence might perhaps establish a distinct contemporaneous oral agreement resting on a wholly separate consideration, which would not at all be within the application of the parol evidence rule. See Williston on Contracts, Rev.Ed., Vol. 3, § 637, p. 1832.

The extrinsic evidence was accordingly permitted to be introduced, subject to the objection, and, as indicated, the court subsequently held that appellees had duly established the existence of an obligation on the part of appellants as to film offering and playing position in the future, such as they claimed had been involved in the settlement transaction. Neither the court's memorandum opinion, findings, nor judgment, however, makes clear whether the court regarded the accord, demonstrated by appellees' extrinsic evidence to have been arrived at, as constituting a distinct contemporaneous oral agreement resting on an independent consideration, or whether it regarded the proved obligation as constituting one that had an inherent legal reality within the corners of the settlement instrument itself, on the basis of the evidence merely affording proper explanation of the ambiguity and doubt that would instinctively arise in a general reader's mind as to the contractual meaning, scope and application of the language used in paragraph number 3.

The provisions of that paragraph had been set out and relied upon in the complaint as demonstrating the lack of any application of paragraph number 1 to whatever rights "as to run, clearance or playing position of the Oak Park Theatre in the future" appellees might have had, and therefore leaving the door open to

having it proved what rights as to "run, clearance or playing position of the Oak Park Theatre" the parties had dealt in relation to, agreed upon, and saved from the bar of paragraph number 1.

If the court deemed the obligation of appellants as to the future rights of the Oak Park Theatre to films and playing position to have been made the subject of a distinct contemporaneous contract outside the doorway of the written settlement agreement and without relationship to any of the provisions thereof, it did not undertake to point out the separate consideration on which it regarded such a contract as having rested. Nor, on a careful reading of the record, can the extrinsic evidence received be said to establish the existence and application of any separate consideration on the part of appellees beyond the borders of the settlement agreement, on which such an independent contract could legally have rested.

Appellees' brief attempts to argue, in relation to the possibility of the trial court having engaged in the theory of an independent contract, that a release of their claim for damages under section 4 of the Clayton Act would be sufficient to support the $100,000 payment covered by paragraph number 1 of the settlement agreement, and that a release of their separate demand for an injunction under section 16 of the Clayton Act would equally be sufficient as a consideration to support a distinct contemporaneous agreement between the parties as to any additional incident or subject matter that had been agreed upon in the settlement dealings.

■ Granting that this might be true, if the parties had actually so split up and apportioned the remedial demands of the prepared complaint for settlement purposes, the fact is, as has been indicated, that the evidence is without any demonstrative basis to view this as having been intended and undertaken to be done. The extrinsic evidence admitted by the court is devoid of any testimony by any witness, or any other indication,

of intent or dealing having existed between the parties at the time to that end. And beyond this, the language of paragraph number 1 of the settlement agreement excludes even a speculative hypothesis that such an apportionment of legal and equitable demands might perhaps have been engaged in, for it contains an express release by appellees, in relation to the $100,000 payment, not merely of appellees' demands at law, but of "any and all causes of action, claims and demands whatsoever, *whether at law or in equity.*" Thus, the language of paragraph number 1 covered generally both appellees' demand for an injunction and their demand for damages—at least sufficiently so as to leave no room in the situation for mere theory or naked hypothesis.

■ But it does not necessarily follow that, because the received extrinsic evidence cannot be said to establish any distinct, contemporaneous agreement, resting on a separate consideration, it therefore must be held that it was erroneously admitted and not entitled to consideration in the present situation. It was still legally admissible, with whatever consequences might be capable of flowing from its receipt and right to judicial consideration, consistent with the instrument as a whole, if the language of the settlement agreement itself suggested and afforded a legal basis for its admission, as a matter of providing explanation to make intelligible any facial ambiguity or contextual uncertainty in some part of the instrument, in order to cause it to have a rational contractual meaning and significance to a general legal reader of the instrument from the inclusion of it therein.

Appellants, as has been suggested, take the position in substance that no parol explanation was necessary or entitled to be made in relation to the settlement instrument, because paragraph number 1 was wholly without any ambiguity on its face, and the expression contained in it as to the $100,000 payment constituted inherently such a statement of contractual term, and not of mere consideration-

al recital or receipt, as to preclude extrinsic evidence of there having been any further considerational undertaking on their part. This argument would be sound, we think, if paragraph number 1 stood or were to be read alone, as representing the only contractual expression or provision in the instrument. But the paragraph did not stand alone and was not entitled to be so read, for the settlement agreement had been made to contain also paragraph number 3, as a coordinate, contractual expression on some matter of some nature which the parties apparently had seen fit to deal on, make reference to, and bring within the corners of the instrument to the extent of writtenly declaring that they were intending to exclude its subject matter—whatever it properly could be found that they meant and understood that subject matter to be—from the operation and application of paragraph number 1.

All that they indicated, however, as to what the nature of the subject matter was that they thus were intending to bring within the corners of the settlement agreement, as a matter of calling attention to it and safeguarding it against effect from any other language used in the agreement, or what the basis or the scope of that subject matter was understood between them to be, was that "Nothing herein [i. e., in paragraph number 1] shall be construed as releasing or affecting any rights Jay Means and Wilma Means may have to run, clearance or playing position of the Oak Park Theatre in the future." Elementarily, it would seem to us that, without previous knowledge or accompanying explanation of any of the facts, circumstances, incidents or other manifestations that had been involved in the parties' dealings and accord, it would not be possible for any legal reader of the contract to have a clear idea or legal concept of just what this provision was intended to be a reflection and consummation of between the parties.

A court, having the parties appear before it for a trial, having them hand up the contract to it for a reading, and having them nakedly state that the question which they were submitting for ruling was simply whether any extrinsic evidence would at all be admissible under the parol evidence rule as to either paragraph number 1 or paragraph number 3, would, in our opinion, after finishing reading the contract, naturally and logically say to the parties that, while paragraph number 1 seemed to be clear, unless they were willing to stipulate as to the intended meaning, scope and consequence of paragraph number 3, the court would have to have something more put before it than the mere language used, if it was to be expected to understand what "rights * * * to run, clearance or playing position of the Oak Park Theatre in the future" the parties had in mind and in what sense or to what end they had undertaken to keep such rights from being in any way involved in or affected by paragraph number 1.

Appellants seek to escape this facial weakness of connotational and applicational uncertainty in paragraph number 3, by contending in their brief that "This paragraph was inserted in the release out of abundance of caution on the part of counsel for appellees lest the release be construed to have discharged future claims, demands and causes of action." In other words, what they argue is, in effect, that the parties simply were referring to the protection which the antitrust statutes themselves afforded appellees against any continued or new, combinational or conspiratorial acts on the part of appellants, such as appellees had charged them with having previously engaged in, and that the paragraph therefore merely was designed to insure or safeguard these statutory rights against any possible prejudice from the settlement agreement. But such rights needed no safeguarding against being prejudiced by the settlement agreement, for there was no way that appellees could at all, either intentionally or by legal import of any language used, have made the absolute and continuing obligation of non-combinational and non-conspiratorial conduct in trade imposed

by the statute upon appellants the subject of any possible release or discharge as to the future.

■ Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy. Cf. Westmoreland Asbestos Co. v. Johns-Manville Corp., D.C.S.D.N.Y., 39 F.Supp. 117, 119. This is because the effect of such a release could be to permit a restraint of trade to be engaged in, which would have impact, not simply between the parties, but upon the public as well. Such a release, if recognized as having any validity of that nature, could therefore itself operatively serve as a contract "in restraint of trade". Section 1 of the Sherman Anti-Trust Act, 15 U.S.C.A. § 1, of course, brands all contracts in restraint of trade as "illegal".

Hence, as suggested above, nothing that had been said in paragraph number 1 of the settlement agreement, or that could have been said, would have been at all capable of affecting any rights of appellees under the statute to protection against improper conduct on the part of appellants in the future, such as the statute forbade. Paragraph number 1 thus could never and would never be read by any court as having any possible legal effect as a release against further violation of the statute by appellants. All that appellants' argument here therefore amounts to is that a court should legally view paragraph number 3 as having been meaninglessly used by the parties in the settlement agreement and as not being capable of having any demonstrable, effective interpretation and application.

■ But courts do not incline to declare a contract provision meaningless and will do so only when such a conclusion is either legally or factually compelled. And unless such a provision must legally be held on its language or in its contextual relationship to preclude any possible intendment and demonstrability of other, effective meaning and purpose, a court has the right to examine any manifestations of intentions which had occurred between the parties in the situation and to accord such an interpretation to them, for which the evidence affords a rational basis, as will give reasonable, lawful and effective meaning to the provision as a part of and in relation to the whole of the instrument. Cf. Restatement, Contracts, § 236.

Here, as we have said, paragraph number 3 does not on its language or in its contextual relationship import any legally absolute or naturally reasonable connotation to a legal reader's mind of just what it was that the parties were attempting to indicate and render certain had been taken out of and safeguarded from any relationship to or implication under the general provisions of paragraph number 1. Appellants' suggestion that the paragraph "was inserted in the release out of an abundance of caution on the part of appellees lest the release be construed to have discharged future (rights under the statute)" is neither a naturally reasonable nor logically satisfying one facially, and especially so in view of the facts (1) that the expression used in paragraph number 3 was concededly the handiwork or product of the attorneys for appellants and not of appellees; (2) that such a reading of the provision as contended for by appellants rendered it contractually meaningless, as discussed above; (3) that there was no recitation or other manifestation in the instrument (and incidentally no indication can be found either in the extrinsic evidence admitted by the court) to suggest that any such meaningless concern had been harbored by anyone or been the subject of any discussion or dealing between the parties; and (4) that the rights which were declared in paragraph number 3 as not to be affected by paragraph number 1 were specified to be "run, clearance or playing position of the Oak Park Theatre in the future," which language, if referrable to appellees' statutory rights, would cover only in partial scope the general protective

rights existing under the statute, and which moreover could not even be said to cover all of the alleged wrongs which appellees had charged that appellants had engaged in against them, and in relation to the whole of which the settlement admittedly had been made.

We hold that paragraph number 3, on its language and in its coordinate contextual position and relationship, was of such ambiguity or doubtfulness, on what the parties had intended it to connote and to provide safeguard for between them, as not to be required facially to be viewed as having had a meaningless significance, such as appellants contended, and that a court was accordingly entitled to seek light and explanation from the extrinsic manifestations of intention which had been involved in the situation, as a basis for having it rendered certain whether the parties in making reference to appellees' future rights as to "run, clearance or playing position" were in fact merely limitatively singling out a partial segment of appellees' general statutory rights, as opposed to the other statutory wrongs which appellees also claimed had been done them, in order to provide meaningless security against the impossible contingency of paragraph number 1 being legally "construed as releasing or affecting" such a particular part of appellees' statutory rights—or whether the parties were intending by the paragraph to make indication of and give written confirmation to the fact of "run, clearance or playing position" rights for the future having had some other and meaningful basis of dealing and accord between them (such as the extrinsic evidence received abundantly established), which rights they for some reason had chosen to make the subject of general identification only and not detailedly to spell out (that reason being shown by the extrinsic evidence to have been the desire of some of the appellants to avoid, for business reasons and other relationships, having their commitment as to appellees' future rights specifically detailed in the instrument) but which general identification and confirmation in the settlement agreement would be sufficient to open up the door to parol explanation if any controversy arose between them.

On this basis, there is no merit in appellants' contention that the extrinsic evidence in question was erroneously admitted. Nor, as we read the findings contained in the record, are we impressed that, because the trial court had hypothetically declared that the evidence might perhaps establish a distinct contemporaneous oral agreement resting on a wholly separate consideration, in connection with its initial statement that it was not momentarily able to say "whether the evidence would undertake to vary the terms of that settlement," it is required to be inferred here that the court necessarily must, in reaching its ultimate conclusion and result, have given consideration and effect to the extrinsic evidence entirely on this basis, and not as a matter of proper explanation of the meaning and significance of the language of paragraph number 3 in its relationship to the rest of the instrument. The court spoke in its memorandum opinion of the accord demonstrated by the extrinsic evidence to have been reached on the future rights of the Oak Park Theatre as a "contract", but, as has been previously pointed out, it did not say that it regarded this part of the accord as having rested on a separate allotment of consideration, and in its findings (Finding XIII) it quoted the language of paragraph number 3 and appears to have dealt with the paragraph as having been inserted in the settlement agreement in manifestation and identification within the corners of the settlement agreement itself of that part of the reached accord which related to appellees' future rights.

Since the evidence was properly admissible in relation to paragraph number 3, as a matter of making intelligible and of showing on what basis the parties had referred to "run, clearance or playing position of the Oak Park Theatre * * * in the future" and what the

182

intended significance of the reference was, it is sufficient here that the court found that the parties had in fact agreed that, in the disposition which they were effecting of the entire controversy, the Oak Park Theatre was thereafter to have a right of second run, on a 28-day clearance basis, and in a playing position of not being subject to competitive bidding, or having films taken away from it, on the part of the theatres of Fox Midwest Theatres, Inc. We repeat once more that the findings do not state or demonstrate that the court regarded this accord on future rights as constituting an agreement outside the purpose and provisions of paragraph number 3. And, again also, Finding XIII, in its quotation and indication of the relationship of the paragraph seems to us reasonably to imply the contrary.

But even if the fact actually had been that the court regarded this portion of the parties' accord as having had a sufficient basis of other consideration on the part of appellees beyond that covered by paragraph number 1, for it to be sustainable outside the written settlement agreement, it seems obvious that any technical remand made by us on this ground for reconsideration by the trial court of this aspect, would only produce the result of the court upholding the accord on future rights on the basis of the admissibility of the evidence in relation to paragraph number 3, as we have indicated was entitled to be done. In any event, however, we again emphasize that the court's findings, for the reasons which have been set out, do not compel the conclusion here that the court viewed the obligation which appellants had assumed as to the Oak Park Theatre in the future as not bearing any relationship to paragraph number 3 and so being outside the provisions of the written agreement.

With the extrinsic evidence involved being admissible to explain the meaning and purpose of the language used in paragraph number 3, as a basis of intelligibility and understanding of what future rights the parties were talking about in this portion of their settlement agreement and what their source and scope were, the court was entitled to accord the paragraph such legal significance or consequence in relation to the provisions of the agreement generally as properly could flow from the receivability of the evidence in giving meaning to the paragraph and to the instrument as a whole.

■ What the evidence established here was, as previously stated, that the parties had reached an accord beyond that expressed in paragraph number 1, which they had not detailedly stated, but only made general identification of and left with ambiguity as to content and source, in their embodying reference to it in paragraph number 3. In other words, the evidence, which was properly receivable to give intelligibility and understanding to paragraph number 3, sufficiently demonstrated and established that the parties had intended and had reached an accord on an element of dealing between them, involving an obligation on the part of appellants, which they had not fully expressed or integrated into their written instrument, but which they had coordinately made the subject of general identification or reference in order to insure its not being affected in any way by what they had said or might otherwise seem to have done in paragraph number 1.

We recognized previously in this opinion that the statement contained in paragraph number 1 was such an apparent contractual expression of considerational terms that, if that paragraph had stood alone in the written agreement, no parol proof would probably have been admissible to establish any other element of considerational undertaking on appellants' part. But, as we thereafter pointed out, the extrinsic evidence here involved was not received in relation to paragraph number 1 but to paragraph number 3. And such additional undertaking as the evidence established had existed in relation to paragraph number 3 could not properly be said to constitute a variance or contradiction as such of

paragraph number 1, for paragraph number 3, whatever its explained provision turned out to be, was expressly declared by the instrument itself to be outside of and not subject in any way to the operation and effect of paragraph number 1. Thus, while paragraph number 1 might otherwise have been on its face a complete integration of the considerational elements of the parties' dealings, this seeming provisional completeness of integration could not be held to be conclusive against such demonstration of actual intent and fact to the contrary as was open to be made through the door of coordinate paragraph number 3, and especially so, as has been emphasized, since the language of that paragraph expressly left whatever subject matter it covered as being outside the operation or effect of paragraph number 1.

Rephrasing what has been said, the effect of the extrinsic evidence here was to demonstrate, from the ambiguity of the language of paragraph number 3 and the exemption of its intended subject matter from anything that appeared in paragraph number 1, that the parties had not in fact embodied with completeness all the aspects of their accord and had not intended the instrument to be treated as a complete integration of the terms of their agreement. The Missouri courts refuse to allow any proof of lack of complete integration "where it appears that the written instrument on its face is full and complete", as a legally meaningful contract. Sol Abrahams & Son Const. Co. v. Osterholm, Mo.App., 136 S.W.2d 86, 92; J. B. Colt Co. v. Gregor, 328 Mo. 1216, 44 S.W.2d 2. But here paragraph number 3, as a coordinate contractual provision, and in its facial uncertainty of meaning and application, could not legally be said to have left the instrument as a whole "full and complete". And the fact that the extrinsic evidence had the effect of leaving paragraph number 1 as not containing a complete statement of the elements of consideration that had been involved in the settlement between the parties could not be argued to preclude the right to consider the evidence, for the test of whether parol evidence varies, contradicts or adds to the provisions of a written instrument necessarily is a matter of reading and giving effect to the instrument as a whole and not of reading and isolating some provision out of its contextual relationship.

While it would not appear to be necessary to set out generally the extrinsic evidence admitted by the court, a statement of some of the things which it showed may serve perhaps to enlighten and add confirmation as to the soundness of the conclusion which the trial court reached.

After negotiations for settlement were begun, counsel for appellees was requested to submit a definite settlement proposal, which he did in writing. The proposal called for the payment of $150,000 in damages, and for a recognition by the charged parties of a right in favor of the Oak Park Theatre, in the future "to a second city run", in a zone consisting of certain named theatres, including the Linwood Theatre of Fox, with each producer and distributor to agree "to offer to Oak Park Theatre its feature pictures on second city run without Oak Park being required to bid against any theatre in said zone or any theatre outside of said zone now owned or operated, directly or indirectly, by Fox," and with these rights in favor of Oak Park Theatre "to continue as long as Oak Park maintains its present relative competitive position among the theatres involved in accordance with the principles laid down in United States v. Paramount," supra, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, and D.C.S.D.N.Y., 85 F.Supp. 881.

The evidence showed no recession by appellees at any time in the settlement negotiations from these demands as to general playing rights in the future. The negotiations which thereafter proceeded between the parties were concerned primarily with obtaining a reduction from appellees in the amount of their damage demand. The sum of $100,000 was finally agreed upon, of which a written acceptance was made by counsel for appellees,

on the stated condition, however, that an appropriate settlement agreement should be prepared and submitted "covering cash settlement and establishing zone for distribution of feature pictures in which Oak Park will have first run in zone except where others in zone demand bidding."

Inquiry had been made of counsel for appellees by the representative of appellants at one stage in the dealings, whether the demand made in appellees' original settlement proposal for the offering of films to Oak Park Theatre in the future, on a second-run basis, "without Oak Park being required to bid against any theatre in said zone or any theatre outside of said zone now owned or operated, directly or indirectly, by Fox," was meant to affect the independent operators in the zone, or whether it had application only to theatres of Fox—to which reply was made that the requirement was of course not being sought in relation to the operators of independent theatres but only as to the theatres controlled by Fox.

Later, when it came to the matter of formulating the settlement into written expression, some of the distributors indicted a desire not to have the instrument fix a precise exhibiting zone, since other theatres might not then be able to be added to the zone, even though they might be or become competitive with the Oak Park Theatre, and the suggestion was made that, if appellees would forego having this aspect formally stated in the instrument, the parties would each communicate the accord which had been arrived at as to appellees' future playing rights to their branch managers in Kansas City for recognition by them and appellees could verify that this had been done before the written agreement was signed. Appellees satisfied themselves as to this communication of their future playing rights having in fact been made to the distributors' local managers, and the attorney for appellants then included in the written agreement paragraph number 3, to the effect, as previously stated, that nothing that was said in the instrument should "be construed as releasing or affecting any rights Jay Means and Wilma Means may have as to run, clearance or playing position of the Oak Park Theatre in the future."

One of the charges which appellees had made against the parties in their prepared complaint was that they had created an exclusive and arbitrary second-run zone in Kansas City for certain Fox Theatres, located outside the competitive exhibiting zone of the Oak Park Theatre, and had by this unlawful means kept appellees from engaging in second-run exhibition. To cover and abolish this artificial-zone situation, Fox gave appellees a letter, stating that "Under present competitive conditions, Fox Midwest Theatres, Inc. waives its right, if any, to prior run or clearance for the Plaza, Isis and Apollo Theatres [the only previously recognized second-run theatres, all of which were Fox-owned] over the Oak Park Theatre." When one of appellees inquired in the course of the consummation of the settlement whether this letter should not also have included Fox's Linwood Theatre, counsel for appellees stated to his clients that the letter was being given only for the purpose of covering Fox theatres located outside of the Oak Park Theatre's playing zone. Oak Park was, of course, agreed to be protected against Linwood, through the oral accord reached as to their immediate zone, which we have recognized as having been given indication in the ambiguous provision of paragraph number 3.

The evidence also contained other elements of confirmation as to the existence of the accord claimed by appellees to have been reached on Oak Park's future rights, in that it showed that shortly after the settlement was made Twentieth Century-Fox Film Corporation began to provide films to its Linwood Theatre for exhibition on a second-run instead of a third-run basis; that when appellees learned thereof they made protest to Fox of such a violation being engaged in of their settlement accord; that Fox thereupon sought to obtain from appellees a modification of this part of appellants'

accord and obligation, which appellees refused to grant; that the Linwood Theatre then ceased to exhibit films of Twentieth Century-Fox Film Corporation on a second run basis, and such films were thereafter duly offered to appellees for exhibition in accordance with the alleged future-rights accord; and that two others of the film producers and distributors similarly did not, after the settlement, allow Linwood to exhibit their pictures on second run as against the Oak Park Theatre, in seeming recognition of the agreement which they had made.

What has been said is, we think, sufficient to demonstrate the warrant for allowing the court's findings and conclusions to stand, as to an undertaking having been made by appellants regarding the rights "to run, clearance or playing position of the Oak Park Theatre in the future," such as appellees claimed —with the intended nature, source and scope of those rights having been given ambiguous identification and incomplete integration in paragraph number 3, whose language and implication however were such as to entitle them to be given fuller establishment by extrinsic evidence of the manifestations which had been involved in the settlement situation.

Appellants have however made the further contention that such an agreement as the extrinsic evidence was found by the court to have established and as we have recognized as being entitled to be affirmed in relation to the language of the settlement agreement, would be "illegal and therefore void and unenforceable." The substance of the argument, as we understand it, is that it would be a violation of the anti-trust statutes for Fox and appellees to enter into any agreement that the Linwood Theatre should not operate as a competitor of the Oak Park Theatre by engaging in second-run exhibition in their mutual playing zone, and that any commitment on the part of the producers and distributors to honor this obligation of Fox as to the Linwood Theatre would itself amount in effect to an unlawful combination and restraint of trade by its consequence of limiting or curbing competition in bidding for motion picture films generally.

But the agreement neither was intended nor could it be said to operate to give the Oak Park Theatre any monopoly of second-run playing position in its exhibiting zone as against any such interest in second-run exhibition in the zone as the public might have generally, even if it were assumed that such an affected interest would be a sufficient basis for having such a monopoly voided. At least seven other theatres were recognized as being located in the immediate zone, all of which were left competitively free to bid against Oak Park for second-run exhibition purposes, if they chose to do so. Only the Linwood Theatre was being prohibited from doing so, and it, as a matter of fact, had never up to that time been operating as a second-run theatre.

We are unable to see, nor does appellants' brief attempt to explain, how an agreement, not shown to have any improper trade effect on the film industry itself, made between two local theatres located in the same general exhibiting zone, that one will subordinate its playing position and not run films desired to be exhibited by the other, until after they have been so exhibited and been subject to regular clearance time, or an agreement on the part of the film distributors of the locality to honor such a good-faith local commercial arrangement between the two, can abstractly, and without more, be declared to be illegal or contrary to public policy. If any restraint of trade violative of the anti-trust statutes, or such substantial detriment to the theatre-going public as might make the agreement void in the public interest, can be involved, it is not facially or inherently apparent and would require legal demonstration.

Appellants' final contention for reversal is that the court erred in the amount of the damages which it awarded and also in the form in which it assessed the damages against the parties.

186

■ On the question of amount, we think appellants' contention of excessiveness is required to be sustained, for our reading of the record fails to show any probative basis on which it was possible for the court to arrive at the $50,000 amount awarded. The evidence does afford a sufficient basis for some substantial award. But the only element of proof that affords any semblance of approach at all to the amount awarded by the court is a general estimate made by one of the appellees himself. He testified that, from his 30-years experience in operating the Oak Park Theatre, it should and would, in his opinion, have had profits of $25,000 a year, during the period involved, except for the actions of appellants in permitting the Linwood Theatre to take films on second run away from it, and in also causing the Oak Park Theatre to have to pay excessive rentals for the films it obtained, from the purported bidding of the Linwood Theatre done against it even on such films. The testimony of this witness had a sufficient basis of proper foundation of competency to entitle it, under Missouri law, to be taken into account, if the court chose to do so, as a factor in arriving at the amount of damages sustained. Cf. Wamsganz v. Blanke-Wenneker Candy Co., Mo.App., 216 S.W. 1025.

■ The court, however, gave weight and use to the witness' testimony, even beyond its face or possible par value. While accepting the witness' estimate of a probable $25,000 annual profit for the approximate two-year period that was involved, if the wrongs of appellants had not been committed, the court apparently overlooked the fact and failed to take into account that his testimony also showed that the Oak Park Theatre had, during this period, notwithstanding appellants' wrongs, made an actual profit of around $10,000. Incidentally, it also may be observed that the rest of appellees' proof on damages, which had a more tangible and testable basis than the general estimate of the witness referred to, all pointed to varying lesser amounts of damage than the estimate of the witness.

■ On the question of the form of the judgment, the court made the entire amount awarded run against all of the appellants jointly—consisting of five of the producers and distributors and Fox Midwest Theatres, Inc. Thus, for purposes of the judgment entry, the legal effect of what the court did was to treat the agreement, which it found to have been made as to "run, clearance or playing position of the Oak Park Theatre in the future," as constituting an undertaking by all of appellants jointly for a performance of the obligation by each of them and against a breach of it by any of them. Cf. Illinois Fuel Co. v. Mobile & O. R. Co., 319 Mo. 889, 8 S.W.2d 834. But at the same time, the court also appears to have regarded three of the eight producers and distributors involved (all of which had been made parties to the suit and none of which had been dismissed by appellees) as not being subject to being so held liable, seemingly in view of the fact that the evidence showed that they had not, as had the other five producers and distributors, permitted the Linwood Theatre to bid against the Oak Park Theatre for any of their films on second run, and the effect of the judgment entry was to grant them release from the case. If the undertaking was a joint one, with a responsibility on the part of all, for a breach committed by any one or more of them, then the three producers and distributors, in effect released by the court, would of course have had as much legal liability for whatever damages had been sustained as the other five.

■ We do not mean to imply that, if the court in fact regarded the obligation as a joint one, in the sense of it having been intended to make all of the parties liable for a breach which might be committed by any one of them individually in not honoring the undertaking to furnish its pictures to the Oak Park Theatre on a second-run basis without

allowing the Linwood Theatre to make bids against the former therefor, the court could not have entered a judgment against any of the parties, unless it was in a position to enter judgment against all. Under V.A.M.S. § 431.140, "In all cases of joint obligations and joint assumptions of co-partners or others, suits may be brought and prosecuted against any one or more of those who are so liable." Appellees thus could in the first instance properly have brought suit against the five producers and distributors here involved only, or it could have brought suit against all eight of them and subsequently have dismissed as to the three, which the court in effect released, without prejudice to its rights against the other five. But that is not what was done. On the record before us, all eight producers and distributors had been made and left parties to the suit, and the position of non-liability which three of them came ultimately to occupy in the proceedings was on the basis of judicial action taken by the court and not of any dismissal made by appellees.

In this situation of two coordinate, inconsistent results and implications being involved in what the court thus did, and with no expression made in relation thereto, we are not certain whether the court was in fact holding that the obligation was a joint one and not a several undertaking on the part of each producer and distributor as to its own films, or whether one or the other of the court's actions was an inadvertent one. We shall therefore leave open for the court to consider and resolve the question of joint or several liability specifically on the remand that is being made.

On the basis of what has been said, the determinations of the trial court as discussed above are affirmed, except in relation to the amount of the damages awarded and the form of the judgment entered thereon. As to the amount and the form of the damage award, and as to the purported release of any defendant in relation thereto, the judgment is vacated, and the cause is remanded for further proceedings on those questions only.