INNOVATION DATA PROCESSING, INC., Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES, CORP., Defendant.

Civ. No. 83–1452.

United States District Court, D. New Jersey.

March 30, 1984.

Pitney, Hardin, Kipp & Szuch by Frederick L. Whitmer, Morristown, N.J., for plaintiff.

Riker, Danzig, Scherer & Hyland by Edward A. Zunz, Jr., Morristown, N.J., and Cravath, Swaine & Moore, by Robert F. Mullen, New York City, for defendant.

HAROLD A. ACKERMAN, District Judge.

This is an antitrust action commenced by plaintiff Innovation Data Processing, Inc. (Innovation) on April 22, 1983. On that date, Innovation filed its complaint accompanied by an order to show cause seeking to enjoin defendant International Business Machine Corporation (IBM) from marketing and shipping to its customers a new piece of computer software called Multiple Virtual System/System Product System Installation Productivity Option Release 3.8J ("IPO"J" "). In its complaint, plaintiff Innovation alleges that IPO"J" constitutes a "tie-in" in violation of Section 1 of the Sherman Act, 15 U.S.C. Section 1, and Section 3 of the Clayton Act, 15 U.S.C. Section 14. Innovation asserts that the "tying" product is the IPO"J," and the "tie-in" product is an IBM software program product known as Data Facilities Data Set Services (DFDSS or Data Set Services program). Innovation claims that the alleged tie was implemented by IBM for the purpose of impeding Innovation's ability to market its own program product, called Fast Dump Restore, (FDR) which competes with IBM's DFDSS program.

Plaintiff's application for a temporary restraining order was heard by my colleague, Judge Sarokin, on April 26, 1983. After hearing oral argument on the application, Judge Sarokin denied the requested relief, ruling in part as follows: "Insofar as the application for a temporary restraining order is concerned, pending a hearing on the preliminary injunction I am going to deny that application. I cannot, based on what is presently before me, conclude that the plaintiff has a likelihood of success on the merits. There is a serious question in my mind, and I think it is evidenced in the discussion we have had—we have all had today, as to whether or not this is indeed a condition imposed by IBM, or whether as (IBM counsel) Mr. Mullen just suggested, that customers are acquiring this license out of choice because they find it to be essential and beneficial to their own operations. But I cannot possibly resolve that factual issue on the record that is now before me.

"I am satisfied that in this interim period, assuming that within a month or possibly two months, at the most, I'll be able to resolve the matter, that plaintiff is not entitled to injunctive relief on the ground that it can prove irreparable injury. There is no substantial evidence before me of any irreparable injury ..."

Following this ruling, the parties commenced discovery of each other in anticipation of a hearing on plaintiff's motion for a preliminary injunction. No such hearing was held, however, because after taking all of the discovery it had requested from IBM, plaintiff voluntarily withdrew its motion for a preliminary injunction on April 30, 1983. This matter is presently before me on plaintiff's motion to strike defendant IBM's third affirmative defense of release, and defendant IBM's motion for summary judgment.

■ I turn first to consider IBM's summary judgment motion. Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is not to be granted unless after all reasonable inferences have been drawn in favor of the non-moving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *See DeLong Corp. v. Raymond International*, 622 F.2d 1135 (3d Cir.1980). On a motion for summary judgment supported by affidavits and depositions, "an adverse party may not rest upon the mere allegations or denials, of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253 at 288, 88 S.Ct. 1575 at 1592, 20

L.Ed.2d 569 (1968). *See also Sound Ship Building Co. v. Bethlehem Steel Co.*, 533 F.2d 96 at Page 99 (3d Cir.) *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). While "summary procedures should be used sparingly in complex anti-trust litigation," *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), this does not rule out the granting of a Rule 56 motion under appropriate circumstances. *See Sound Ship Building Co. v. Bethlehem Steel Co.*, 533 F.2d 96, 99–100 (3d Cir.), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976), (summary judgment granted on antitrust claim). As Justice Marshall stated in *First National Bank v. Cities Services Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968): "While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint."

Applying these standards to the matter before me I have determined to grant IBM's motion for summary judgment as the plaintiff's per se tying claim, but to deny it as to the plaintiff's claim that the general standards of the Acts have been violated.

The undisputed facts relevant to this motion are as follows: IBM produces and markets a wide range of computer products, including hardware, such as central processing units and disk and tape storage devices and software, such as operating system programs. It is the latter that is involved in this action.

An "operating system" is a set of computer programs which guide and control the basic function of a computer. These operating system programs also provide the necessary link between the physical "hardware" and the various applications programs "software", designed to perform specific tasks, such as accounting, word-processing, payroll or even video games.

The IBM operating system involved in this lawsuit is called the Multiple Virtual System, or "MVS," and is IBM's largest and most complex system of operating system programs. It is designed for use with very large or "high-end" IBM or IBM plug-compatible (PCM) computers, and the various programs which together constitute the MVS. The MVS collectively contain more than five million lines of computer instructions. IBM does not license MVS or any other operating system, at a single-price, aggregated fee. Rather, a customer must separately license the various separate underlying operating system programs which would together make up that particular user's MVS.

It is undisputed that IBM's customers are not required to license all or any particular combination of these programs. Instead, they may choose to license any one or more of them at their option, and may even order operating system programs designed by IBM competitors in place of, or in addition to, IBM's programs. Plaintiff Innovation's FDR offering and its optional enhancement COMPAKTOR and Automatic Backup and Recovery constitute such an alternative or supplemental program.

The specific operating system program at issue in this case is IBM's competitive equivalent to the FDR, the DFDSS program, which was introduced in 1980. Both DFDSS and FDR are known as "dump-restore" programs, which enable a computer user to transfer information to (the "dump" function) and from (the "restore" function) computer disks and tapes. DFDSS is also capable of the process of loading other MVS operating system programs into a computer system for the first time.

This process, along with that of loading new or revised versions of MVS into a computer program is very complex and delicate. Generally, such installation entails the transfer of the MVS programs from the source computer tapes on to data storage disks, which are housed within the

user's computers system in storage devices known as disk drives. In the past, defendant IBM has supplied its customers with an operating system for which IBM did not charge and which could be used in that installation process.

More recently, IBM customers were given the option of licensing from IBM at a fee the DFDSS program which represented an improvement over the program which IBM had provided at no fee, or of licensing at a fee some other version of an IBM dump/restore program to perform the "restore" function necessary to install MVS.

IBM produces improvements to existing operating system installation programs at irregular intervals which have historically been about 6 to 18 months. These improvements have been marketed to users since 1976 as Installation Productivity Options, or "IPO"s, and consist of optionally available packages of basic operating system programs and detailed sets of written in instructions.

IBM has offered about 61 IPO's for various operating systems, including 17 for MVS. At the time this suit was commenced, IBM's newest and most advanced MVS Installation Productivity Option was IPO"J", which became generally available on April 19, 1983. As with former Installation Productivity Options, IPO"J", was and is available in two packaged formats; an "integrated" format and a "segmented" format. The integrated version consists of a preselected group of components that correspond to an underlying group of operating system programs. The integrated IPO"J" was denied to facilitate the installation of the MVS operating system, and the "dramatic" time efficiencies achieved through its use in this regard have saved IBM itself an estimated 13 and $15 million, or roughly 200 employee years in labor which would otherwise have been expended in installing MVS.

Among the changes which IBM instituted was the introduction of IPO"J" was in the formatting of computer instructions and data on the computer tape which the user would receive from IBM for transfer or "loading" onto the user's computer disk. Prior to the introduction of IPO"J", IBM had offered users the choice or ability to load earlier IPO's onto disks through the use of other formats such as IEHDASDR (IBM's cost-free dump and restore computer program) or another such program, IEBCOPY. With the release of IPO"J" IBM instituted a change of format which now requires new users to license IBM's DFDSS program for which a fee is charged in order to load the system. IEHDASDR and IEBCOPY may no longer be used to achieve this function. As a further aspect of this change, IBM has chosen to incorporate into the integrated version of IPO"J" the DFDSS program which such new customers must use for the load function. The DFDSS program is, as I have previously stated, the allegedly "tied" product in this case.

The loading function of dump/restore programs such as IBM's DFDSS program, and Innovations's FDR is only a very small part of the installation of an IPO. Innovation's FDR in fact has never been able to load an IPO tape. The real importance of a dump/restore program lies in its ability to "back up" data which is located on disks to magnetic tape, and in recovering the information when necessary. These two functions are a critical part of the operation of a computer center, since such back up copies of data and programs are needed as security for such disasters as fire, flood and equipment failure and accidental erasure. In the past, Innovation has depended upon receiving orders from FDR after customers had restored their computer systems, given that FDR is not offered by the computer manufacturers to purchasers of larger IBM and IBM-compatable computers. These purchasers would have the freedom to use, as I have indicated, IBM's free dump/restore program which is IEHDASDR, or they could obtain a license for a priced program to accomplish that task such as IBM's DFDSS program, or Innovation's FDR, by requiring new customers to license DFDSS to load new IPO's. Plaintiff contends that IBM has eliminated this

freedom of choice as a practical matter forcing the customer to hold onto the DFDSS program. And use it as a dump/restore program in anticipation of the need to use it to load future IPO's and to avoid the technical and administrative problems associated with a decision to license a competing product such as Innovation's FDR.

Plaintiff thus argues that IBM's inclusion of the DFDSS program in the integrated IPO format constitutes a per se tying arrangement and a violation of the Sherman and Clayton Acts.

IBM responds by stating that it added the DFDSS program to the integrated IPO"J" for several legitimate business and technological reasons. First, many IBM customers had reportedly indicated that they wanted the program to be incorporated into any new Installation Productivity Option offering. Second, it is undisputed that, at present, the DFDSS is the only program product available from any source which is technologically capable of loading the MVS operating system from tape onto IBM's technologically-advanced model 3375 disk drives without the assistance of a preexisting operating system. While plaintiff's expert John Iannantuoni disputes the underlying technical rationale or basis for this fact, and suggests that as an alternative IBM could have modified its other dump/restore programs such as IEHDASDR or IEBCOPY to be able to work with the model 3375's, the fact remains that IBM has not chosen to do so—nor, of course, has plaintiff chosen to modify FDR. So as to be able to perform the load function for these or about other disk drives.

Finally, DFDSS is the only currently maintained dump/restore program capable of loading the integrated IPO"J" into *any* disk drive without the assistance of a preexisting operating system—although this, of course, is the result of a format decision by IBM. Which plaintiff might characterize as self-serving.

The IPO"J" is also available in a segmented version, which is composed, at the customer's option, of various components of the integrated version. A segmented IPO"J" may or may not include the DFDSS program, depending on the customer's choice. While the integrated version of IPO"J" is particularly suited to new users of MVS, who do not yet have an MVS operating system, "up" and functioning in their computer systems, the segmented version is more suited for existing users of MVS who may wish to use only specific components of IPO"J" or who may wish to install only certain new programs. In either version, the customer does not pay for or license the IPO"J" materials as such, but must separately license the underlying programs selected.

I note that if a customer orders either the integrated version of IPO"J" or includes that DFDSS program as part of the segmented version, he or she may cancel the DFDSS program license at any time. If this cancellation occurs within 30 days, the customer incurs no charge for the license. If the cancellation occurs later we understand there is, as of April there is a $67.00 per month charge.

Thus, it is possible for a customer to order the integrated IPO"J" and use the DFDSS program only to provide the installation or loading function and thereafter cancel the DFDSS license—even achieving that load function for free if the cancellation is within the 30-day period.

IBM points to its undisputed marketing experience record to highlight the nonillusory nature of these options which are offered to its customers. Through the end of 1983, 781 customers in the United States had ordered and received IPO"J". New MVS users ordering the integrated version accounted for 227 of that total. Of the remainder, 304 users order the integrated version and 250 ordered a segmented version. Of that 250, roughly half ordered a segment that did not include the DFDSS program. Thus, while nearly 85 percent of these orders included the DFDSS program, the option to exclude it was exercised by some. Defendant IBM thus contends there is no tying arrangement in these circum-

stances and that it has not violated the Sherman or Clayton Acts.

■ To prove a per se illegal tie-in, a plaintiff must establish three distinct elements: "First, he must establish that the conduct in question was a tie-in: 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product'. *Northern Pacific Railway v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Second, he must establish that the seller 'has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product.' See Page 6, page 518, 78 S.Ct. of the Northern Pacific decision. Third, he must establish that 'a "not insubstantial" amount of interstate commerce is affected'." See *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, at Pages 1223 and 1224 (3d Cir.1976) *cert. denied*, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1977). As Judge Aldisert emphasized in *Dunkin' Donuts*, ". . . coercion is implicit—both logically and linguistically—in the concept of leverage upon which the illegality of tying is premised: The seller with market power in one market uses that power as a 'lever' to force acceptance of his product in another market. If the product in the second market would be accepted any way, because of its own merit, then, of course, no leverage is involved . . ." See Page 1218 of that opinion.

The Supreme Court in the *Northern Pacific Railway* case which was referred to by Judge Aldisert in Dunkin' Donuts as "perhaps the fountainhead of tying law under Section 1 of the Sherman Act," explained the marketplace rationale for forbidding tying arrangements. The Court stated that where such arrangements "are successfully and exacted, competition on the merits with respect to the tied product is inevitably curbed . . . They deny competitor's free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price, but because of his

power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products." See *Northern Pacific Railway v. United States*, 356 U.S. at Pages 5 and 6, 78 S.Ct. at Page 518. See also *Bogus v. American Speech & Hearing Association*, file of 582 F.2d 277 (3d Cir.1978); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir.1978), *cert. denied* 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1979). Finally, as Justice Black noted in the *Northern Pacific* case, "(o)f course where the buyer is free to take either product by itself, there is no tying problem even though the seller may also offer the two items as a unit at a single price." 356 U.S., page 6 at note 4, 78 S.Ct., page 518 at note 4.

■ I conclude that here IBM customers are for the purposes of the Sherman and Clayton Acts free to take either the DFDSS program or the IPO"J" by itself and that on this basics alone there is no illegal tying arrangement. Three uncontradicted facts confirm this conclusion. First, any IBM customer is free to license the DFDSS program at any time by itself. Second, any IBM customer can order IPO"J" in a segmented version which does not include the DFDSS program. And, third, any IBM customer who orders the DFDSS program, whether by itself or together with either a segmented or integrated version of IPO"J", is free to cancel the license for the program at any time, paying the license fee only for the period of usage. While plaintiff argues that users may be dissuaded from such a cancellation buy the technical and administrative burdens associated therewith, it admits that the terms and procedure for such a cancellation are the same as those for any other IBM license. Thus, as a matter of law, in the absence of evidence that the purchase of the alleged tied product was required as a condition of sale of the alleged tying product—rather than merely as a prerequisite for practical and effective use of the tying product—Innovation has failed to show the requisite coercion necessary to establish a per se illegal tying arrangement. See *Foremost*

*Pro Color, Inc. v. Eastman Kodak,* 703 F.2d 534 at 542 (9th Cir.1983).

■ There is, in addition, another basis for granting IBM's motion for summary judgment as to plaintiff's per se tying claim, and that is that the integrated IPO"J" rather than constituting an illegal tying arrangement, instead constitutes—on this undisputed record—a lawful package of technologically interrelated components. Even if the components of IPO"J" were not priced separately and available individually, there would still be no unlawful "tie." As the Ninth Circuit has stated, "it is not an unlawful tying arrangement for a seller to include several items in a single mandatory package when the items may be reasonably considered to constitute parts of a single distinct product." See *International Manufacturing Company v. Landon, Inc.,* 336 F.2d 723 at 730 (9th Cir. 1964), *cert. denied sub nom. Jacuzzi Bros., Inc. v. Landon, Inc.,* 379 U.S. 988, 85 S.Ct. 701, 13 L.Ed.2d 610 (1965). Further, as Judge Wallace has recently stated, "as a general rule ... we hold that the development in introduction of a system of technologically interrelated products is not sufficient alone to establish a per se unlawful tying arrangement even if the new products are incompatable with the products then offered by the competition and effective use of any one of the new products necessitates purchase of some or all of the others." See *Foremost Pro Color v. Eastman Kodak, Inc.,* 703 F.2d at pages 542 and 43.

IBM has sufficient justification to offer the DFDSS program as part of the integrated Installation Productivity Option "J". In addition, to the reported sentiments or preferences of its customers, the DFDSS program is the only IBM dump/restore program that is currently capable of loading an integrated format tape onto a disk without the assistance of a pre-existing operating system, typical of the situation facing a new MVS customer, and it is admittedly *the only program available anywhere* which can thus load an IBM model 3375 disk drive absent a pre-existing operating system.

Under these circumstances IBM would have justified in offering only an integrated version of IPO"J"—as a single product and at a single price. See *California Computer Products v. International Business Machines Corp.,* 613 F.2d 727 at 744 (9th Cir.1979); *Hirsh v. Martindale Hubbell,* 674 F.2d 1343, at 1348 (9th Cir.) *cert. denied* 459 U.S. 973, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982); *Telex v. IBM Corporation,* 367 F.Supp. 258 at 347 (N.D.Okl. 1973), *affirmed in relevant part,* 510 F.2d 894 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

Thus, because IBM, under these circumstances, could have properly chosen to offer IPO"J" without giving its customers the option of licensing its components separately, it is clear that IBM's actual conduct here cannot constitute an unlawful tying arrangement. For both this reason and because of the lack of any legally sufficient showing of coercion, I conclude that plaintiff has failed to demonstrate the existence of a per se unlawful tying arrangement. I will therefore grant defendant's motion for summary judgment as to this claim.

■ Plaintiff, however notes that even if it fails on its *per se* illegal tying arrangement theory, it must still be entitled to proceed under its claim that defendant IBM's practices violate the general standards of the Sherman and Clayton Acts. As Justice Black noted in *Fortner Enterprises v. U.S. Steel,* 394 U.S. 495 at page 500, 89 S.Ct. 1252 at page 1257, 22 L.Ed.2d 495 (1959), (Fortner) "(a) plaintiff can still prevail on the merits (if it) can prove, on the basis of a more thorough examination of the purposes and effects of the practices involved, that the general standards of the Sherman Act have been violated." The standards guiding such an inquiry are, of course, known as the "rule of reason." *U.S. Steel Corp. v. Fortner Enterprises,* 429 U.S. 610 at 612 note 1, 97 S.Ct. 861 at 863–64 note 1, 51 L.Ed.2d 80 (1977) (Fortner II). This more generalized claim presents genuine issues of material fact which preclude my granting summary judgment at this time. These issues in-

clude *inter alia* defendants IBM's intent, motive or purpose in linking the DFDSS program to the IPO"J"; its practical effect on competition; its practical effect both beneficial and detrimental—in use by customers and the nature and circumstances of the business the parties are engaged in. See *Chicago Board of Trade v. United States,* 246 U.S. 231 at 238, 38 S.Ct. 242 at 243–44, 62 L.Ed. 683 (1918) (Brandeis, J.). *See also* Areeda & Turner, *Antitrust Law* Section 31 (1978).

Therefore, I must deny defendant's motion for summary judgment as to plaintiff's claim that defendant IBM violated the general rule of reason standards in introducing the integrated version of IPO"J" which included the DFDSS program as one of its components.

I next turn to Innovation's motion to strike IBM's affirmative defense of release. In IBM's Third Affirmative Defense, it contends that plaintiff Innovation's claim are barred by the terms of a written Release Agreement and entered into by the parties in 1976—which is attached as Exhibit A to the affidavit of Mr. Reid. Plaintiff argues that this release agreement, insofar as it may be interpreted to exculpate IBM from liability for subsequent antitrust violations, is void as against public policy.

Both parties are in agreement that a release purporting to extinguish any and all future claims for violations of the federal antitrust laws is void or voidable as against public policy. See *Three Rivers Motor Company v. Ford Motor Company,* 522 F.2d 885 at 896 (3d Cir.1975). The rationale for this rule was clearly articulated in *Fox Midwest Theatres v. Means,* 221 F.2d 173 at 180 (8th Cir.1955): "(A)ny contractual provision which would be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy. Is this is because the effect of such a release could be to permit a restraint of trade to be engaged in, which would have impact not simply between the parties but between the

public as well. Such a release, if recognized as having any validity of that nature, could therefore itself operatively serve as a contract 'in restraint of trade ...'"

See also *Gaines v. Carrollton Tobacco Board of Trade, Inc.,* 386 F.2d 757 at 759 (6th Cir.1967); *Taxin v. Food Fair Stores, Inc.,* 181 F.Supp. 181, at Page 185, (E.D.Pa. 1960), *affirmed,* 287 F.2d 448 (3d Cir.1961).

These authorities clearly demonstrate that defendant IBM's Third Affirmative Defense is legally insufficient. The essence of plaintiff Innovation's claim in this matter is that IBM—by means of conduct clearly commencing several years after the execution of the Release Agreement and relating to a program product not even then in existence has created an unlawful tying arrangement. The only way in which the Release Agreement could here serve as an affirmative defense for IBM would be if it had application as against antitrust violations occurring after the date of the release. Because some prospective applications are clearly against public policy, See *Redel's, Inc. v. General Electric Company,* 498 F.2d 95 (5th Cir.1975), and because no conceivable reformation of the Release Agreement could make it both applicable to the alleged tying arrangement and harmonize it with this public policy. I will grant plaintiff's motion to strike IBM's Third Affirmative Defense.

I note Mr. Mullen has urged this Court to defer application of a ruling on this subject today for pragmatic reasons. I tried to indicate during the course of this colloquy that the law in this instance must transcend pragmatism.

In sum, I have determined to grant a partial—defendant a partial summary judgment as to plaintiff's *per se* tying claim but to deny summary judgment as to plaintiff's general "rule of reason" claims. I have also decided to grant plaintiff's motion to strike IBM's Third Affirmative Defense of release.